EUGENE DANIELSON v. HENRY C. REEVES
AND ANOTHER.[1]

January 2, 1942.

No. 32,975.

[1]Reported in 1 N. W. (2d) 597.

492

*Hoke, Cobb & Janes,* for appellants.

*Ben R. Toensing, George L. Weasler,* and *Tautges, Eichelzer & Tautges,* for respondent.

JULIUS J. OLSON, JUSTICE.

Negligence action, wherein plaintiff prevailed. Defendants' motion for judgment notwithstanding or a new trial was denied, and they appeal.

Defendants, a copartnership doing business as "Heinies Cafe," operate a cafe and bar in Minneapolis commonly known as a "Nite Club." They are the holders of both tavern and dance-hall licenses. To attract and retain patronage, they employed a dance orchestra "from 8:45 until 12:45 on week nights, and on Saturday nights it is open longer, till 1:45" Sunday morning. Early in April 1940, as an additional means of entertainment and undoubtedly to augment their business of providing for the hungry and thirsty, they "billed" something new and exciting known as "hobbyhorse races," with two to four races an evening several nights a week. Four horses were entered in each race, manned, usually, by two men and two women. A bottle of wine was awarded to the winner, who "had to drink it there," since defendants had no "off-sale" license.

The hobbyhorse in question, a contrivance about 18 inches in height from seat to floor, is mounted on two separate rockers about 18 inches long, joined together by a cross rung at the rear, and suspended from a fulcrum concealed inside the body of the horse. The front of each rocker ends in a pedal-like footrest about 6 inches long and 3 inches wide. Between these two rockers is another rocker about 15 inches long and 4 inches wide, also suspended from a fulcrum inside the body of the horse. All three rockers operate in a pendulous fashion. A flat seat about 12 inches long and 6 inches wide forms the top part of the body of the horse. A handle about 4 inches long protrudes from each side of the horse's head. The rider, upon taking his seat on the horse, is required to place his feet on the forward portions or pedals of

the side rockers, and then, by swinging his body back and forth, all three rockers are so motivated as to cause the horse to move forward or backward depending upon the position of the rockers and the fulcrums when the rider's motion is commenced. The contraption, "constructed of wood in the caricature of a fractious horse," is designed to provide a tricky method of unhorsing the rider so that "most of the time they [the riders] fell off backwards." These "were wild horses"; hence when the "show" started the "master of ceremonies" would announce: "We are just about ready for the first hobbyhorse race * * *. We have four of the wildest hobbyhorses in town, *War Admiral, Pony Boy,* etc." Then, when every contestant was ready, the master of ceremonies would say: "One, two, three, let's go!" "Then we would play 'The Old Gray Mare' and try to make a big race out of it." And "if somebody fell off, which they usually do, we would make a big, loud noise on the drum, then we asked everybody to cheer if they had friends out there [in the audience], to give them the third degree." The seating capacity for the audience exceeded 200, and on the night presently to be mentioned there were between 125 and 175 persons present.

Near midnight of April 22, 1940, plaintiff and a friend entered defendants' establishment, went to the bar, ordered a bottle of beer, and were about to drink it when the "master of ceremonies" announced that a hobbyhorse race was about to begin. Plaintiff and his companion walked toward the roped-off portion of the dance floor where the race was to take place, a space estimated at 15 to 20 feet in length. Four hobbyhorses were lined up, and two women had already entered as contestants. Plaintiff, a big, husky man nearly six feet in height and weighing 240 pounds, and his friend were invited to join. As they got to the starting line the race was commenced. Plaintiff testified that he did not have time to examine the horse before the race started and knew nothing about hobbyhorses, never having seen or even heard of one before. However, he got onto the horse and sought to operate it with his feet upon the floor. He had moved only about six

inches when he was told by the officiating "master" to put his feet on the forward portion of the rear rockers or he would be disqualified. He did so, and at once the horse "just went up in the air" and "turned right over," causing plaintiff to fall backward. He landed on the floor with his hands back of him and felt a sharp pain in his right wrist. He did not then realize that he had been seriously hurt, so he remounted the horse, but had the same experience, except that the second time he caught himself on his knees in time to avert a more serious fall. That ended his race. Shortly thereafter he discovered that he had no strength in his wrist. Professional examination disclosed that he had fractured "the scaphoid bone in the right wrist joint."

For defendants there was testimony that the general custom was to demonstrate the operation of these horses before each race so that prospective contestants would be informed of what might be expected; also, that contestants were informed that if they entered the risk was theirs. In addition, guards were usually furnished during the races to see that riders did not fall too hard. This was provided "mostly" for the benefit of "women folks." Both plaintiff and his friend testified that there were no guards, no warning of the propensities of the horses, and no information that the riders were in the race "at your own risk."

One of the hobbyhorses, used as an exhibit, is before us. We have examined it. Being laymen, at least as to hobbyhorses, as was plaintiff, it is fairly apparent that the contraption is, to say the least, a "tricky cayuse." Having observed, during oral argument, the antics of the exhibit as demonstrated by counsel for defendants, we have made no effort to ride it. Its structural intricacies and bad behavior, made apparent by the demonstration, have warned us not to experiment with it, since we might be charged, as was plaintiff, with contributory negligence if harm resulted.

The fact that two ladies generally participated in these races perhaps made the race that much more spectacular, since there is compelling evidence that when lady riders fell backwards their

feet would go up in the air, causing jeers and cheers on the part of the audience at what was then to be seen. Such antics unquestionably furnished much entertainment to a crowd composed, as undoubtedly this was, of the class frequenting such places. As a source of merriment to such people, the "show" must have been a real thriller. It was probably more enticing and alluring than the slapstick antics of motion picture comedians. They, however, did not lack in training before the event, while here contestants, and especially the plaintiff, were novices.

For reversal, defendants claim that the court erred (1) in refusing to grant their motion for judgment, and (2) in refusing to grant their "motion for a new trial made upon the ground that the verdict is not justified by the evidence." We shall consider these in their inverse order, since, if defendants are in error in respect to the second ground, clearly they cannot hope to prevail as to the first.

One may readily agree with defendants' theory that this case "falls within that general class of cases dealing with the liability to their patrons of proprietors of places of amusement," and that whether their hobbyhorse activity "is to be termed a sport or an amusement, * * * the principles of law involved would seem to be of general application."

■ That defendants were under the general duty of exercising reasonable care for the safety of their patrons is conceded. Wells v. Minneapolis B. & A. Assn. 122 Minn. 327, 142 N. W. 706, 46 L.R.A.(N.S.) 606, Ann. Cas. 1914D, 922; Klaman v. Hitchcock, 181 Minn. 109, 231 N. W. 716. This duty necessarily extended not only to the care of their premises but also to any instrumentalities under their control. Attebury v. Jones, 161 Minn. 295, 202 N. W. 337; Brown v. Rhoades, 126 Me. 186, 137 A. 58, 53 A. L. R. 834. To absolve oneself from a charge of negligence, the care to be exercised is that of "due or ordinary care," and this necessarily "varies with the situation and circumstances of each particular case, but the standard remains the same." Klaman v. Hitchcock, 181 Minn. 109, 111, 231 N. W. 716.

■ The duty resting upon the proprietor of an establishment of this sort requires him to warn his patrons of any dangers of which he has knowledge but as to which his patron has none, unless the danger is such as to be readily observable, or observed, by him in the exercise of reasonable care for his own safety. Brown v. Rhoades, *supra.* This court has held in several cases that proprietors or managers of places of amusement or entertainment are held to a more strict accountability for injury to patrons than owners of private premises generally. While the rule is that such proprietor or manager is not an insurer of the safety of patrons, he does owe them what (181 Minn. 111, 231 N. W. 717), *"under the particular circumstances,* is 'ordinary' or 'reasonable' care" (italics supplied), that is, care commensurate with the risk involved.

■ The facts recited, we think, amply justify the findings by the jury that there was actionable negligence on the part of defendants, that plaintiff did not assume the risk, and that he was not guilty of contributory negligence. Certainly we cannot say that, as a matter of law, the verdict is without support. In these circumstances the order must be, and it is, affirmed.

Affirmed.

