## OSCAR AHLSTROM v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILROAD COMPANY.[1]

February 18, 1955.

No. 36,255.

---

[1]Reported in 68 N. W. (2d) 873.

*William J. Quinn* and *Fordyce W. Crouch,* for appellant.
*William H. DeParcq, Donald T. Barbeau, H. O. Chommie* and
*O. C. Adamson II,* for respondent.

CHRISTIANSON, JUSTICE.
This action was brought in the Hennepin county district court
to recover damages for personal injuries sustained by plaintiff on

October 7, 1947, as the result of an accident which occurred upon the premises of defendant, Minneapolis, St. Paul and Sault Ste. Marie Railroad Company, hereinafter called the Soo Line. At the close of all the testimony, defendant moved for a directed verdict and its motion was denied. Subsequently the jury returned a verdict for plaintiff awarding him damages in the sum of $275,000. Defendant appeals from an order denying its alternative motion for judgment notwithstanding the verdict or for a new trial.

At the time of the accident, plaintiff was 21 years of age and lived in Thief River Falls, Minnesota. His formal education ceased at the age of 16 when he quit school while in the eighth grade. Prior to the accident he had been employed in a local creamery washing bottles and cleaning up after operations, driving a truck during the winter ice harvest, and delivering ice throughout said city. Also, he had served for two years in the navy, worked as a carpenter, and driven a dump truck and taxi cab. On August 28, 1947, he commenced work as a truck driver for the O'Hara Fuel & Transfer Company in Thief River Falls at 75 cents per hour with time and a half for overtime over 40 hours per week. His gross earnings from the date of his employment by the O'Hara company through October 7, 1947, the date of the accident, were $296.99. Prior to the accident he had never earned $500 from private employment in any given year. Plaintiff is unmarried, and although he lives with his parents, he has never contributed financially to them.

The O'Hara Fuel & Transfer Company is engaged in a general freight hauling and moving business in Thief River Falls. Since March 16, 1938, it has contracted with defendant railroad for the hauling of "less-than-carload freight" between defendant's freight depot at Thief River Falls and defendant's consignors and consignees. On the day of the accident, plaintiff was instructed by Shorty O'Hara, a co-owner of the O'Hara company, to pick up freight at defendant's freight depot and to deliver it to consignees throughout the city.

Plaintiff arrived at the Soo Line warehouse at approximately 8:30 a. m. in an International truck owned by the O'Hara company.

The weather was good and there was no wind. In accordance with the custom of O'Hara drivers, plaintiff backed his truck up to freight door No. 3, which was on the west side of the warehouse, so that the endgate of the truck, which was supported in a horizontal position by chains, was "just about" level with the warehouse floor. Plaintiff shut off the truck motor, set the brakes, and left the gears in reverse. Next, plaintiff set a steel plate, which was four feet long, three feet wide, and one-quarter of an inch thick, between the warehouse floor and the endgate of the truck so that it extended from the rear edge of the van of the truck to the warehouse floor surface. This entire procedure was observed by defendant's employee, Pete Amundson, who had worked in the warehouse as a foreman, a trucker, and a freight checker since 1918.

After emplacing the steel plate, plaintiff proceeded to the warehouse cashier's office where he received three copies of the freight bills listing freight to be delivered that day. Plaintiff sorted these according to the addressees, and after returning to the freight house area, he gave one copy to Pete Amundson, the freight checker. Although plaintiff testified that he usually signed all receipts for the day before loading the truck, it appears that on the day in question he did not sign the freight bills until after loading in accordance with the general practice among truck drivers by reason of the fact that the signed bills constituted receipts for freight supposedly received by the trucking company.[2] At the time in question Pete Amundson was working alone since three other warehouse employees had left the warehouse temporarily to view the scene of a nearby train derailment.

The hauling contract between the Soo Line and the O'Hara company provided:

"(a) * * * All loading and unloading of such freight shall be done by the Contractor at the Contractor's sole expense.

* * * * *

---

[2]The freight bill which listed the crate that fell on plaintiff was not signed by plaintiff but by Amundson. Plaintiff claims that this was due to the fact that there was a crate missing in the shipment.

"INDEPENDENT CONTRACTOR

"(b) The Contractor shall employ and direct all persons performing any service hereunder and such persons shall be and remain the sole employes of and subject to the control and direction of the Contractor and not the employes or subject to the direction and control of the Railroad Company, it being the intention of the parties hereto that the Contractor shall be and remain an independent contractor and that nothing herein contained shall be construed as inconsistent with that status."

The Soo Line's warehouse employees customarily co-operated with the O'Hara drivers by helping to load the items of freight in the order and location designated by the O'Hara employees, and plaintiff testified that Amundson supervised and gave instructions to him regarding the work of loading the truck.

After both Amundson and plaintiff had loaded three or four articles by hand, Amundson called plaintiff's attention to a crate standing between eight to ten feet from door No. 3. This crate was 5 feet 11¾ inches high, 4 feet 8 inches wide, and 2 feet 5¾ inches thick, and it stood upright on all four corners of one of its 2-foot-5¾-inch-by-4-foot-8-inch sides. The freight bill listed its weight at 1,200 pounds, but investigation following the accident established that it actually weighed 900 pounds. The crate contained a large sterilizer consigned to St. Luke's Hospital in Thief River Falls. Plaintiff testified that he did not read the freight bill or have any knowledge of the crate's weight or contents before starting to move it.

On his own initiative, Amundson procured a two-wheel hand truck from the warehouse and with plaintiff's help placed the blade of the truck under the crate. Next, at Amundson's instruction, plaintiff went to the east side of the crate, and after tipping it against the bed of the hand truck, he helped Amundson move the crate the ten feet to freight door No. 3 with the blade of the hand truck sliding on the floor. In this operation plaintiff pushed on the east side of the crate and Amundson pulled on the hand truck handles on the west side of the crate. Upon reaching the freight door,

plaintiff and defendant were able to pull the crate onto the steel plate,[3] but after crossing the plate, the wheels of the hand truck slipped into a 2 and 5/16-inch crevice between the rear edge of the truck van and the edge of the tail gate. After several futile attempts at raising the crate onto the floor of the truck van, during which plaintiff first pushed on the east side of the crate and then moved around inside the van and pulled on the handles and resting arms of the hand truck, Amundson decided to go to the cashier's office for help. Plaintiff let go of the hand truck first, and then Amundson released his grip. Thus the hand truck was left with its wheels in the crevice, its blade resting on the steel plate, and the crate tilted back against the bed of the hand truck. At this point plaintiff asked Amundson if they should set the crate upright, but Amundson said "No, it is all right." Both men silently contemplated the position of the crate for approximately half a minute before Amundson left. Plaintiff admits that he knew the crate was a little top-heavy at this time but he did not know how much and was not sure. Although two of the three Soo Line warehouse employees who originally moved the crate from a box car into the freight house had previously warned Amundson of its dangerous weight distribution, Amundson did not repeat the warning to plaintiff.

After Amundson left, plaintiff stood facing the interior of the truck van with his back to the crate which was approximately four feet away. After 10 or 15 seconds, he glanced over his shoulder and saw the crate start to tip toward him. Plaintiff turned, and, in an attempt to prevent the crate from falling, took a two- or three-foot step toward the crate and grasped it near the top. However, the crate was too heavy and its momentum crushed plaintiff so that he was doubled up in a sitting position on the floor of the van with his legs pointed into the truck van and his head bent forward between

---

[3]At this point it should be noted that plaintiff testified that the hand truck became stalled at the east end of the metal plate, *i.e.*, when the men were attempting to raise it onto the steel plate from the warehouse floor. However, upon appeal plaintiff has accepted the testimony of defendant's witness Amundson that the truck was stalled in the crevice as being more favorable to the verdict.

his knees. Plaintiff was found in this position when Amundson returned. Plaintiff testified that he had not touched the crate before it tipped, but defendant introduced uncontradicted expert testimony to show that under normal conditions on a level floor, it would take 79 pounds of horizontal pressure on the handles of the hand truck to tip the crate over. After the accident the wheels of the hand truck were resting on the steel plate which supports the theory that the truck was stuck in the crevice between the rear edge of the truck van and the west edge of the steel plate.

Following the accident, plaintiff was the subject of extensive medical treatment. In medical terminology, his injury was described as a compression fracture of the twelfth thoracic and first lumbar vertebrae of the spinal column which involved the crushing and liquifying of the spinal cord in that area and additional damage to the cord for about $1\frac{1}{2}$ to 2 inches higher in the area of the eighth to tenth thoracic vertebrae. This injury has serious repercussions on plaintiff's ability to lead a normal life. He has complete motor and sensory paralysis of the lower half of his body which extends downward from a line immediately below the navel. His only sensations in the region are occasional pains and crawling sensations in his legs similar to "phantom pains" of amputees. Plaintiff has no control over his bladder and bowels, and since he has not fully developed an automatic bladder, he must wear a leg urinal. Also, he must remove stools by use of a rubber glove. Because of this lack of control, accidental discharge of his bladder and bowels has caused him great embarrassment and humiliation.

Due to the height of his injury, plaintiff's back tends to "cave in" whenever he attempts to stand, and this condition makes it impossible for him to effectively wear braces or use crutches despite extensive training while at Hines-Vaughn Veterans Hospital in Chicago. As a result he will be confined to a wheel chair for the rest of his life and must lie down every few hours to prevent blisters and pressure sores on his buttocks. Plaintiff's medical experts testified that he needs a personal attendant 10 to 12 hours during the day. Furthermore, plaintiff has lost all sexual powers. Plaintiff's injuries are

permanent, and there is no hope for future improvement by natural growth or by surgical fusion of the spinal column. However, he may be expected to enjoy a normal life expectancy of 40.75 years.

Although plaintiff has broken his leg in an automobile collision since the accident in question, this injury and several neck and head cuts from another auto accident have not affected his disability. Plaintiff is able to drive his specially equipped car and has learned to enter and leave it without assistance by use of his arms and hands. Also, he can fold up his wheel chair and carry it with him if it works all right and does not stick. Socially, plaintiff goes to dances and numerous movies. However, on these occasions he is restricted to his wheel chair. During the five years since his injury plaintiff has made no attempt at occupational rehabilitation, but plaintiff's medical expert recommended rehabilitation to a desk or bench job.

Defendant at the outset contends that the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. It asserts that plaintiff failed to prove any actionable negligence on the part of Pete Amundson, its freight checker, and that, in any event, having participated and acquiesced in leaving the crate in a tilted position against the bed of the hand truck and having attempted to prevent it from falling, plaintiff either assumed the risk of any hazard therefrom or was contributorily negligent as a matter of law.

■ The rule that must govern our consideration of these questions has been stated fully in Johnson v. Evanski, 221 Minn. 323, 327, 22 N. W. (2d) 213, 215:

"Taking, as we must, the view of the evidence most favorable to the verdict, a motion for a judgment notwithstanding, whether based on negligence or on contributory negligence, should be denied unless the evidence in support of the verdict, and all reasonable inferences to be drawn therefrom, be so wholly incredible and unworthy of belief or so conclusively overcome by other uncontradicted evidence that the want of negligence or the presence of contributory negligence is so clear as to leave no room for an honest difference of opinion among reasonable men."

NEGLIGENCE

■ It is undisputed that plaintiff was upon defendant's premises as a business visitor and invitee and that defendant was under a duty to exercise reasonable care to avoid exposing plaintiff to unreasonable risks of injury.[4] Reasonable care is that degree of care which a reasonably prudent person would exercise under the same or similar circumstances. It must be commensurate with the risks of the situation as they were, or should have been, reasonably anticipated by the actor. If no risk could have been reasonably anticipated as a result of the act or omission, there can be no negligence predicated upon such act or omission.[5]

Defendant's initial claim is that Amundson was not negligent in leaving the crate in a tilted position on the hand truck. To support this argument, defendant points to the testimony of Dr. Alfred O. C. Nier, a physicist from the University of Minnesota, that it would require 79 pounds of horizontal pressure on the handles of the hand truck to tip over the 900-pound crate and sterilizer when in its tilted position. Although this expert testimony was not directly contradicted by plaintiff at the trial, it not only assumed that the unit was on a level floor but also was based upon experiments performed under ideal conditions in a hospital corridor and the use of a "reconstructed" crate. However, even if we assume for purposes of this opinion that the jury was bound to accept Dr. Nier's testimony with respect to the center of gravity of the tilted crate on the hand truck as a physical fact, the effectiveness of defendant's attack on plaintiff's version of the accident through the medium of physical impossibility depends on several specific facts which had to be determined by the jury from the conflicting testimony. First, the location of the hand truck when it stalled was claimed to be at the east end of the metal plate by plaintiff, and at the west end of the plate in the $2\frac{5}{16}$-inch crevice between the metal skid and rear edge

[4]*E.g.*, Blomberg v. Trupukka, 210 Minn. 523, 299 N. W. 11; Prosser, Torts, § 79, pp. 636, 642.

[5]Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N. W. (2d) 73; Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804; 13 Dunnell, Dig. (3 ed.) § 6972.

of the truck van by Amundson.[6] Second, the fact that plaintiff and Amundson moved the crate as they did without its falling does not, as defendant contends, dictate that a reasonable man "could not anticipate or foresee that the unit would fall when left unattended." Actually, when the permissible inference to be drawn from the action of the three other warehouse employees in setting the crate upright on all four corners with the blade of the truck under the crate when on a level floor instead of employing the "unusual" practice of leaving it tilted back at an angle on the bed of the hand truck is combined with the prior warnings of danger to Amundson, the facts clearly indicate that the jury could find that Amundson should have foreseen the danger of leaving the crate tipped and unattended with the wheels of the hand truck in the position he said they were in. Certainly, we cannot say in view of these circumstances that the want of negligence on the part of Amundson in leaving the crate tilted as he did is so clear as to leave no room for an honest difference of opinion among reasonable men.

The brunt of defendant's attack, however, is concentrated on the proposition that Amundson was not negligent in failing to warn plaintiff of the top-heavy nature of the crate and the danger in leaving the crate in a tilted position against the bed of the hand trunk. Amundson admits that he was warned of the danger of its unusual weight distribution by two of the three warehouse employees who moved the crate into the warehouse earlier that morning, but his claim that he warned plaintiff that the crate was top-heavy obviously was rejected by the jury.

Defendant throughout its brief assumes that the accident happened as a result of the ordinary operation of the law of gravity

---

[6]Plaintiff has chosen to adopt Amundson's view of the location on appeal for the obvious reason that having the wheels in the crevice would tend to unbalance the crate because the wheels of the hand truck would be lower than the blade and the angle of the crate as it was tilted against the bed of the truck would vary an unknown number of degrees from that assumed by Dr. Nier. Thus the suggested possible compression of the truck's springs or the vibration of a passing train or highway truck might reasonably cause the operative movement leading to the tipping of the crate.

and that it owed no duty to warn plaintiff of such dangers. Thus, it cites as controlling authority Blomberg v. Trupukka, 210 Minn. 523, 299 N. W. 11, where it was held that the defendant was not negligent in failing to warn a business visitor that a pile of metal siding ten, eight, and seven feet long weighing approximately 600 pounds, which the latter undertook to hold upright, would tip if permitted to get out of equilibrium, and Hetager v. Moran, 168 Minn. 491, 495, 210 N. W. 390, 392, where this court said that a master is not under a duty to warn a servant unloading a cargo of merchandise by means of a hand truck that "the weight of the package if great will tax the strength of the operator when the load is tipped backwards unless the center of gravity is balanced so as to be near the axel [sic] of the truck."[7] Defendant also relies upon Tomczek v. Johnson, 110 Minn. 320, 125 N. W. 268, where a master was held not to be negligent for failure to warn a common laborer in a quarry of the danger that a large granite rock which was placed on its narrow side or edge might fall from a car if it were jolted, and Manley v. Minneapolis Paint Co. 76 Minn. 169, 78 N. W. 1050, where it was held that a master was not obliged to warn or instruct a 24-year-old employee of the dangers incident to rolling barrels weighing 400 pounds from a car down an 18-inch plank to a platform. Finally defendant cites Boyer v. Eastern Ry. Co. 87 Minn. 367, 92 N. W. 326, where this court in reversing an order overruling a general demurrer to the complaint stated that the employer owed no duty to warn of dangers incident to unloading logs from a flat car.[8]

Clear cut as the principles of these cases may be, it should be noted that in every case cited by defendant the danger was both simple and apparent to a viewer of the external aspects of the situation. Furthermore, in Hetager v. Moran this court said (168 Minn. 495, 210 N. W. 392):

[7]Modified on rehearing as not affecting plaintiff's rights if the pleadings were amended to bring the action under the Jones Act. Hetager v. Moran, 168 Minn. 496, 210 N. W. 864.

[8]In Dell v. McGrath, 92 Minn. 187, 99 N. W. 629, the Boyer case was expressly distinguished from a fact situation where the unloading was done by power and the risks were not as apparent in the more complicated work.

"* * * It is only the latent or hidden ones [dangers] which must be warned against."

and in Blomberg v. Trupukka, *supra,* when considering the duty owed to a business visitor, the court stated (210 Minn. 527, 299 N. W. 13) :

"* * * Of course there is a duty to warn against extraordinary and hidden dangers such as the fact that a top-heavy machine balanced by a detachable part will topple over if the part is removed. Peterson v. American Grass Twine Co. 90 Minn. 343, 96 N. W. 913."

From the evidence in the instant case the jury could reasonably find that the wheels of the hand truck became lodged in the $2\frac{5}{16}$-inch space between the endgate and the van of the truck; that although plaintiff was not warned that the crate was top-heavy, he knew after moving it that it was a little top-heavy but he did not know how much and he was not sure; and that when he inquired about the safety involved in leaving the crate tilted, he was assured that it was "all right" by defendant's warehouseman of 30 years' experience with superior knowledge. The crate in question was not excessively tall in comparison to its width and breadth, being 5 feet 11¾ inches tall, 4 feet 8 inches wide, and 2 feet 5¾ inches thick, and other external characteristics gave no indication of its top-heavy nature. Moreover, two other warehouse employees took the time to warn Amundson, an employee of 30 years' experience, that the crate was dangerous due to its peculiar weight distribution. This evidence indicates that the extraordinary weight distribution inside this crate, which materially raised its center of gravity so as to make it tip easily when left in a tilted position against the bed of the hand truck, was a "hidden" or "latent" danger rather than an obvious and simple danger as involved in the cases cited by defendant.[9] Far more analogous to the facts of the instant case is Peterson v. American Grass Twine Co. 90 Minn. 343, 96 N. W. 913, where, in considering the master-servant relationship which is not

[9]See, Johnson v. Johnston, 226 Minn. 388, 33 N. W. (2d) 53, where the Blomberg case is interpreted as applying to a situation where the danger is patent and obvious.

involved here, this court classified the top-heavy condition of a press as a hidden and latent danger and imposed liability upon the master for failing to warn of the condition.[10] The court there stated (90 Minn. 345, 96 N. W. 913) that a master is obliged to warn and instruct his servant:

"* * * where the work is attended with peculiar conditions, not known to the servant, increasing the risks and hazards of the employment, * * *."

In our opinion the same principle is equally applicable to the situation presented here. Cf. Danielson v. Reeves, 211 Minn. 491, 1 N. W. (2d) 597; Theisen v. Minnesota Power & Light Co. 200 Minn. 515, 274 N. W. 617; Gulf, C. & S. F. Ry. Co. v. Irick (Tex. Civ. App.) 116 S. W. (2d) 1099.

In view of Amundson's prior knowledge that the crate was top-heavy, a jury could find that in the exercise of reasonable care he should have anticipated the danger in leaving the crate tilted against the bed of the hand truck with its wheels in the position he stated they were in. Furthermore, since the jury could also find that Amundson failed to warn plaintiff of the crate's dangerous weight distribution and that the danger therefrom was neither apparent nor readily observable to one in plaintiff's position in the exercise of reasonable care for his own safety, we cannot say that the trial court erred in concluding that a fact question was presented on the issue of defendant's negligence.

CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF RISK

■ Although the line of demarcation between contributory negligence and assumption of risk is thin, this court has distinguished between the two doctrines. In Schrader v. Kriesel, 232 Minn. 238, 247, 45 N. W. (2d) 395, 400, we said:

"* * * Notice or knowledge and appreciation of the danger are indispensable to an assumption of risk. * * * Assumption of risk involves comprehension that a peril is to be encountered and a will-

---

[10]See, also, Beardsley v. Murray Iron Works Co. 129 Iowa 675, 106 N. W. 180; Parsons v. Hammond Packing Co. 96 Mo. App. 372, 70 S. W. 519.

ingness to encounter it. It differs from contributory negligence, based on carelessness, by being an exercise of intelligent choice."

It seems clear that the defense of assumption of risk was not established as a matter of law with respect to plaintiff's acquiescence in leaving the crate in a tilted position since the record does not conclusively establish that plaintiff anticipated or should have anticipated that it would fall or that his actions indicated a willingness to meet any risk of injury therefrom. However, the broader and oft-inclusive concept of contributory negligence, which requires that plaintiff's conduct be tested against the degree of care which would be employed by a person of ordinary prudence under the same or similar circumstances, presents a more difficult question.

In addition to giving the general instructions on contributory negligence, the trial court specifically instructed the jury as follows:

"If you find that plaintiff unbalanced the crate or the two-wheel truck after Amundson went for help, then your verdict must be for the defendant.

"If you find that the plaintiff attempted to move the crate alone, while defendant's employee was seeking help, then plaintiff was guilty of contributory negligence, and you are instructed that plaintiff cannot recover from defendant in this action."

In view of the verdict for plaintiff it is apparent that the jury believed plaintiff's testimony that he did not touch the crate until it was already falling. Furthermore, it seems clear that it was for the jury to determine from the conflicting evidence and the permissible inferences therefrom whether plaintiff had had prior experience in handling freight of this weight and weight distribution,[11] whether he knew or should have known of the top-heavy nature of the crate

---

[11]Defendant introduced approximately 1,000 freight bills signed by plaintiff at either the Soo Line or Great Northern freight depots to show that plaintiff had had experience handling similar heavy objects. However, plaintiff testified that he did not handle the heavy items listed on the freight bills and he had never moved a box or crate the size and weight of the one in question. His testimony in this respect was corroborated to a considerable extent by his employers.

in question, and whether he had been assured by Amundson that the crate was all right and it was not necessary to set the crate upright.

In support of its contention that plaintiff was guilty of contributory negligence or assumed the risk as a matter of law, defendant attempts to advance three basic concepts with the cases it cites. Thus it relies upon Tomczek v. Johnson, *supra*, Walsh v. St. Paul & D. R. Co. 27 Minn. 367, 8 N. W. 145, and Motey v. Pickle Marble & Granite Co. (8 Cir.) 74 F. 155, where it was held that an employee is presumed to know the effect of the ordinary operation of the law of gravity. In the respective cases this meant that the plaintiff was presumed to know that a rock which he placed in an insecure position on a cart would fall if jolted; that a millstone with a bulge on one side will tip over if not kept in proper equilibrium; and that marble slabs will tip over if one side of the wagon in which they are standing is depressed. However, these cases are clearly distinguishable because the insecure position of the rock, the bulge in the millstone, and the slanting of the wagon bed, which were the operating facts causing the law of gravity to affect the object, were fully apparent to the injured plaintiffs; whereas, in the instant case, the evidence most favorable to the verdict shows that plaintiff did not appreciate the extent of the peculiar weight distribution of the crate since the peculiarly high position of the center of gravity of the crate was due to internal and not external factors. Similarly, Peterson v. Minnesota Power & Light Co. 206 Minn. 268, 288 N. W. 588, is also distinguishable since the danger of physical contact with unobscured electrical wires is far more apparent than the danger of the invisible weight distribution of a wooden crate of this size and weight.

The second theory advanced by defendant is that a hand truck is a simple tool and that plaintiff should have appreciated the danger of leaving the crate in a tilted position against the bed of the hand truck from his five weeks' experience as a truck driver for the O'Hara company. The case of Hetager v. Moran, *supra*, relied upon by defendant, is distinguishable since there this court merely observed that a hand-truck operator must appreciate the obvious dan-

ger that if a known overly heavy box on a hand truck is tipped over backward, it will tax his strength and cause the loaded hand truck to fall.

Finally, defendant cites Galland v. G. N. Ry. Co. 101 Minn. 540, 111 N. W. 1133, and Soutar v. Minneapolis I. E. Co. 68 Minn. 18, 70 N. W. 796, in support of the proposition that Amundson's assurance of safety would not excuse plaintiff from actions constituting contributory negligence. The trial court instructed the jury in this respect as follows:

"Plaintiff claims that defendant's employee, Amundson, told plaintiff that the crate and hand truck would be all right while he was seeking help. Whether or not Amundson made such a statement, plaintiff would be required to exercise ordinary care for his own safety under the circumstances. If you find that plaintiff failed to exercise ordinary care for his own safety and that such failure was a proximate cause of the accident and his injuries, then he cannot recover in this action against defendant, and your verdict must be for defendant."

In light of the jury's determination that plaintiff was not contributorily negligent and our conclusion that the issue was one of fact for the jury, the question of excuses for conduct which might otherwise constitute contributory negligence is moot. Moreover, the cases relied upon are distinguishable as involving assurances of safety concerning dangers which were equally apparent to the assurer and the person assured. In the instant case, Amundson, the assurer, knew of the top-heavy character and danger of the crate due to the warning given him by two other warehouse employees, while plaintiff, the assured, knew of neither the extent of top-heaviness nor the danger from the internal weight distribution of the crate.

Defendant also asserts that plaintiff was contributorily negligent or he assumed the risk as a matter of law by taking a step of two or three feet toward the crate after seeing it start to tip and trying to prevent it from falling. Here again, since the jury would have been justified in finding that plaintiff stepped quickly without thinking and did not comprehend and willingly meet the danger of moving

toward the falling crate, we find no basis for holding that he assumed the risk as a matter of law. See, Schrader v. Kriesel, *supra;* Lincoln v. Cambridge-Radisson Co. 235 Minn. 20, 49 N. W. (2d) 1.

This leaves for consideration whether plaintiff's act in stepping toward the crate and trying to prevent it from falling constituted contributory negligence as a matter of law. In this connection the trial court properly denied plaintiff's requested instruction with respect to the emergency doctrine which is aimed at adjusting the level of the required standard of care in accordance with any sudden peril confronting the actor. As this court stated in Nicholas v. Minnesota Milk Co. 212 Minn. 333, 335, 4 N. W. (2d) 84, 85: "The rule is inapplicable unless it be first determined that there existed a real peril to which the party seeking its protection did not contribute by his own want of care." See, also, Naylor v. McDonald, 185 Minn. 518, 241 N. W. 674. While the jury has found that plaintiff did not contribute by his own want of care to any peril in this case, the basic fact of a "real peril" which affected plaintiff's choice of movement is missing. The evidence shows that plaintiff stepped toward the crate merely to keep it from falling to the floor and not out of desperation in an attempt to keep from being struck.

In this case, the jury could find not only that plaintiff was unaware of the peculiar weight distribution inside the crate but also that it was not unreasonable for plaintiff, motivated as he was by a desire to protect the freight from damage, to believe that he could prevent the crate from tipping farther since he had previously tipped the crate onto the bed of the hand truck and, with the help of Amundson, was able to move the truck ten feet across the floor to the steel plate, up the one-fourth-inch rise, and over the steel plate. In Blomberg v. Trupukka, *supra,* also cited by defendant in this connection, this court merely said that it was not negligence for defendant to fail to warn plaintiff that certain metal siding which he was holding would fall if it became unbalanced without discussing the question of contributory negligence. Although, as defendant contends, plaintiff's knowledge of the weight of the object may have been greater here than in the Blomberg case, plaintiff's

18

lack of knowledge concerning the peculiar weight distribution hidden inside the crate and its resultant effect on the tendency of the crate with such momentum as to prevent his righting it[12] and his prior successful efforts in tipping and moving the crate leave room for honest differences of opinion among reasonable men as to plaintiff's compliance with the standard of care which would be exercised by a person of ordinary prudence under the same or similar circumstances. Cf. Mayzlik v. Lansing Elev. Co. 241 Minn. 468, 63 N. W. (2d) 380. For these reasons we conclude that the trial court did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

### Loaned-Servant Principle

■  Defendant asserts that the trial court erred in denying certain requested instructions with reference to the loaned-servant principle. It contends that from the evidence presented a jury would be justified in finding that Pete Amundson was a loaned servant of the O'Hara Fuel & Transfer Company at the time in question and that, therefore, it was error for the trial court to instruct the jury as a matter of law that Amundson's negligence, if any, would be imputed to the defendant railroad company.

This court has adopted the "right of control or direction" test for determination of an employee's status as a loaned servant. Nepstad v. Lambert, 235 Minn. 1, 50 N. W. (2d) 614, 36 Minn. L. Rev. 290; St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637; Roe v. Winston, 86 Minn. 77, 90 N. W. 122; Wicklund v. North Star Timber Co. 205 Minn. 595, 287 N. W. 7. Such "right of control or direction" should not be found merely because an employer has the right to direct the end result of the work, but

---

[12]The mere fact that plaintiff knew that the crate was heavy and that it would be dangerous to be under it does not establish contributory negligence as a matter of law. It was the high center of gravity which caused the weight to push down so forcibly on plaintiff and prevented him from righting the crate. Plaintiff was unaware of this factor; at least the jury could so find. Cf. Theisen v. Minnesota Power & Light Co. 200 Minn. 515, 274 N. W. 617; Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 10 N. W. (2d) 398.

the crucial factor is the right to direct the manner and mode of performing the work. Antonelly v. Adam, 175 Minn. 438, 221 N. W. 716; Chapman v. Peoples Ice Co. 125 Minn. 168, 145 N. W. 1073. In view of the duel control concept, whereby an employee may have a general and special employer, and the laudable policy of imposing liability on that employer most able to prevent occurrence of the injury, this court has construed the loaned-servant principle as demanding that the special employer shall have the right to exercise "detailed authoritative control" over another's servant before liability will shift from the general employer to the special employer under the doctrine of *respondeat superior*. Nepstad v. Lambert, *supra*.[13] The source of the employee's wages and the right of discharge should be considered as elements of such control, but they are not necessarily conclusive. Nepstad v. Lambert, *supra;* Boll v. C. S. Brackett Co. 134 Minn. 268, 158 N. W. 609, 159 N. W. 1095; Roe v. Winston, *supra*.

The facts of the instant case actually come directly under the anticipatory dictum in Nepstad v. Lambert, where we said (235 Minn. 14, 50 N. W. [2d] 622):

"* * * Detailed authoritative control must be distinguished from mere designation of work or suggestions made incident to encouraging cooperation between related activities on large projects."

Defendant, however, claims that the following facts show that plaintiff as an O'Hara employee had a "right of control" over Amundson

[13]In Crawford v. Duluth, M. & I. R. Ry. Co. 220 Minn. 225, 19 N. W. (2d) 384, which was an action under the Federal Employers' Liability Act, this court held that the employee's assent to the change of employers was required. This view has also been adopted by this court in workmen's compensation cases on the theory that a person's chosen employer cannot be switched without his assent. *E.g.*, Melhus v. Sam Johnson & Sons Fisheries Co. Inc. 188 Minn. 304, 347 N. W. 2; but such assent need not be explicit. Pocrnich v. Snyder Min. Co. 233 Minn. 81, 45 N. W. (2d) 794. However, we do not consider the employee's assent to be vital to the shift of liability from the general employer to the special employer under the doctrine of *respondeat superior* since it is a third person's rights against a certain employer and not an employee's rights against a chosen employer with which we are concerned in this type of case.

consonant with the test set forth in the Nepstad case. The O'Hara company or its employees determined (1) the order of loading articles of freight into the truck, (2) the number of articles to be loaded into the truck, (3) where articles were to be placed in the truck, (4) when trucks would pick up the items of freight, and (5) how many trips would be made each day. However, do these facts show that plaintiff or the O'Hara company employees exercised or had the right to exercise "detailed authoritative control" over Amundson's method and manner of performing his work? Such directions regarding the order of loading, number, and location of articles in the truck merely pertain to the end result of the work and do not affect the method and manner of performing the initial work of actually moving freight from the warehouse onto the delivery trucks.

The record establishes that Amundson used the two-wheel hand truck without instruction from plaintiff. He also directed plaintiff's action in tipping the crate onto the bed of the hand truck, and plaintiff and other O'Hara employees testified that as a general practice defendant's warehouse employees told them what to do when moving freight. Furthermore, the O'Hara company neither paid Amundson nor had any power to discharge him. At most the evidence discloses that a co-operative relationship existed between defendant's warehouse employees and the O'Hara company and not "detailed authoritative control" as required by the Nepstad case.

Defendant argues that regardless of the lack of evidence of actual control, Amundson could have been found to be a loaned servant of the O'Hara company in view of the provisions of the hauling contract and this court's classification of actual control as mere evidence of the "right of control" in the Nepstad case.[14]

---

[14]In the Nepstad case the crane operator was bound to act only upon signals from the special employer's employees under the actual working arrangements. When the accident occurred, the crane operator allegedly had acted without a signal. The *lack of actual control* was found merely in the specific act causing the injury, and we held that this evidence of lack of actual control did not vitiate the special employer's overall "right to control" the crane operator under the working arrangement.

It seems clear that the O'Hara company occupied the status of an independent contractor since the hauling contract itself states:

"(a) * * * All hauling and unloading of such freight shall be done by the Contractor at the Contractor's sole expense.

\* \* \* \* \*

"INDEPENDENT CONTRACTOR

"(b) The Contractor shall employ and direct all persons performing any service hereunder and such persons shall be and remain the sole employes of and subject to the control and direction of the Contractor and not the employes or subject to the direction and control of the Railroad Company, *it being the intention of the parties hereto that the Contractor shall be and remain an independent contractor and that nothing herein contained shall be construed as inconsistent with that status.*" (Italics supplied.)

Being a Soo Line employee, Amundson's status was that of an employee of an employer of an independent contractor, and normally in such a position he would not be subject to the independent contractor's control. This situation is clearly distinguishable from that presented in the Nepstad case where there was no evidence to support a finding that the crane operator was employed in the status of an independent contractor and it conclusively appeared that at the time of the accident he was subject to the detailed authoritative control of the special employer. The quoted provisions of the hauling contract not appearing in italics contemplate merely the status of the O'Hara employees and the O'Hara company as an independent contractor and do not purport or even affirmatively suggest that the Soo Line warehouse employees should ever become loaned servants of the O'Hara company. Thus, when considering the possible application of the loaned-servant principle to the facts of the instant case, we are confronted at the outset with the absence of any express contractual basis to support an affirmative finding of a "right of control" on the part of the O'Hara company over Amundson or defendant's warehouse employees. Consequently, to establish any basis for application of the loaned-servant principle, it was incumbent upon defendant to show that it was the custom and practice for the

O'Hara company through its employees to exercise detailed authoritative control over defendant's warehouse employees in the freight-loading operations. This it failed to do. In fact, as previously pointed out, the evidence pertaining to actual control negates such a contention. We therefore conclude that the loaned-servant principle was not applicable to the facts of this case and that the trial court properly denied defendant's requested instructions with respect thereto.

Defendant's further assignments of error with respect to its requested instructions have been carefully considered but found to present no grounds for reversal.

### RULINGS ON EVIDENCE

■ Defendant also contends that the trial court erred in admitting certain testimony with reference to the custom and practice among defendant's warehouse employees to co-operate and supervise the loading of freight onto the delivery trucks over its objection that this was an attempt to vary the terms of an unambiguous written contract by parol testimony. We find no merit in this contention. Since defendant maintained that Amundson was a loaned servant of the O'Hara company, it was entirely proper for plaintiff to introduce evidence to negate any factual basis for the application of the loaned-servant principle. As previously noted, the provisions of the hauling contract do not even affirmatively suggest that the railroad's employees should ever become loaned servants of the O'Hara company. In fact, these provisions refer only to the O'Hara employees and do not purport to give the O'Hara company the right to regulate or control the railroad's employees. The most that can be said in defendant's behalf is that the provisions of the hauling contract are ambiguous and not clear regarding the subject matter of the foregoing testimony. Even so, the parol evidence rule would not preclude this testimony. See, 7 Dunnell, Dig. (3 ed.) § 3405. Furthermore, since the witnesses testifying to the custom and practice of defendant's warehouse employees co-operating and supervising the O'Hara employees in the loading of freight had considerable prior experience

with the actual working procedures at the Soo Line warehouse, we find no error in the admission of this testimony.

We also find no grounds for a new trial in the trial court's reception of Dr. Harry B. Hall's opinion as to the reasonable cost of a practical male nurse or attendant for plaintiff at Thief River Falls. Dr. Hall, a Minneapolis orthopedist, was permitted to give his opinion based upon his knowledge and experience with many patients from the northern part of the state and particularly Crookston and Virginia that the cost of such attendant, working a ten- or twelve-hour shift, would be about $10 a day. This testimony was not disputed by defendant. In Steller v. Thomas, 232 Minn. 275, 45 N. W. (2d) 537, we rejected an evaluation of the market value of lumber in Minneapolis based on knowledge of such value in Remer, Minnesota, but not in "the Minneapolis area" for lack of foundation. However, in that case there was no similarity of location and economic conditions such as exists in cities of the size of Thief River Falls, Virginia, and Crookston in the northern part of our state.

Defendant also contends that it was error to admit the testimony of plaintiff's witnesses Edwin J. Montour, Gerald O'Hara, Clair O'Hara, and Grover R. Stephen to the effect that it was an "unusual" practice to leave a 1,000- to 1,200-pound crate of this size in a tilted position against the bed of a hand truck. Each of these witnesses had considerable experience in moving freight by hand truck, and we are satisfied that they were qualified to testify regarding a "usual" or "unusual" practice in this type of work. We find no reversible error in the admission of this testimony. See, Ross v. Duluth, M. & I. R. Ry. Co. 207 Minn. 157, 290 N. W. 566; Gibson v. Iowa Cent. Ry. Co. 115 Minn. 147, 131 N. W. 1057; 13 Dunnell, Dig. (3 ed.) §§ 7049 and 7050. Likewise, we are of the opinion that Montour's testimony regarding the various "usual and customary methods" of moving a crate of the size and weight of that involved in the instant case was properly received.

Defendant further contends that there was no adequate foundation for admission of the foregoing expert testimony because it was based upon the handling of a hypothetical crate weighing 1,000 to

1,200 pounds and not 900 pounds as the crate in the instant case. However, the record discloses that Amundson acted under the assumption that the crate weighed 1,000 to 1,200 pounds and that its actual weight was not determined until after the accident. From all that appears from the record plaintiff's counsel did not learn of its true weight until it was disclosed by defendant later on in the trial, and thereafter no motion to strike the foregoing testimony was made. Under these circumstances we cannot say that it was error to have received this testimony.

## DAMAGES

■ Defendant contends that the verdict awarding plaintiff damages in the sum of $275,000 is grossly excessive and the result of passion and prejudice on the part of the jury. The physical condition of plaintiff is doubtlessly very serious. Here we have a young man, 26 years of age at the time of trial, who has complete motor and sensory paralysis of the lower half of his body downward from a line just below the navel. His condition is such that he will be confined to a wheel chair for the rest of his life since he cannot use braces or crutches effectively, and, viewing the evidence thereon in the light most favorable to the verdict, he will need the services of a daytime attendant for the remainder of his life. Plaintiff has no control over his bladder and bowels and will be subject to public embarrassment and humiliation therefrom. Also, he has no prospect of a normal married life since he has lost all sexual powers. There is no hope for either natural or surgical improvement of his condition during the estimated 40.75 years remaining of his life. In addition to this tragic physical condition, plaintiff is mentally untrained for a physically incapacitated life. He has had only an eighth grade education, and his occupational experience has involved such manual labor as truck and taxi driving or sweeping and cleaning up about a creamery. Plaintiff has no trade or special skill and at the time of trial had not attempted occupational rehabilitation in accordance with his physical condition and abilities. Prior to the accident, plaintiff had never earned $500 income from private employment in any single year.

Faced with the foregoing facts, the jury in the instant case was asked to determine the damages caused to this young man by defendant's alleged negligence. Plaintiff's counsel submitted the following figures, *inter alia,* to the jury as being acceptable:

| | |
|---|---:|
| Loss of wages to the time of trial ($225.37 per month for 61 months) | $ 13,747.57 |
| Medical expenses at hospital | 9,356.50 |
| Nursing at home by parents ($300 per month for 31 months) | 9,300.00 |
| Cost of daily attendant in the future ($10 per day or $304.16 per month) | 86,347.98* |
| Loss of future earning capacity ($300 per month) | 85,167.00* |
| Pain and suffering and disability— past and future ($5 per day for 40.75 years) | 91,670.00 |
| | $295,589.05 |

The jury apparently worked from these figures in arriving at the total sum of $275,000, and plaintiff's counsel seeks to sustain the amount of the verdict as reasonable by use of the same figures in this court.

The judicial function of determining the amount of a verdict in a personal injury case has been historically preserved to the jury[15] and where, as in this case, the trial court has allowed the verdict to stand upon a motion for a new trial based upon the claimed excessiveness of a verdict, appellate courts are not prone to interfere

*These figures were arrived at by multiplying the present cash value of one dollar, payable monthly over a period of 40.75 years, plaintiff's estimated life expectancy, and discounted by compounding interest at the rate of three percent annually, or $283.89, by the amount per month desired.

[15]M. S. A. 546.22 provides: "When a verdict is found for the plaintiff in an action for the recovery of money, or for the defendant when a counterclaim for the recovery of money is established beyond the amount of the plaintiff's claim as established, the jury shall assess the amount of the recovery."

unless it clearly appears that it was an abuse of judicial discretion to permit the verdict to stand.[16] Couched in other terms, it has been said that an appellate court should not revise the amount of a verdict unless it shocks its "sense of justice" and "the impropriety of allowing the verdict to stand is so manifest as to show a clear abuse of discretion,"[17] or "unless it is fairly evident that he [the trial judge] failed to keep the jury within the bounds of reason and common sense."[18] Under these ineffective generalities which supposedly delineate the area of appellate review of damages and aided by the judicially construed materiality of the decreased value of the American dollar,[19] plaintiffs in recent years have successfully resisted appellate attack on increasingly large personal injury verdicts. To support the verdict in this case, plaintiff has pointed to the cases of Florida Power & Light Co. v. Robinson (Fla.) 68 So. (2d) 406, and Kieffer v. Blue Seal Chemical Co. (D. N. J.) 107 F. Supp. 288, (3 Cir.) 196 F. (2d) 614, where verdicts of $225,360 and $250,000 respectively were allowed to stand. We have repeatedly held that due to variance in fact situations concerning, for example, the injured person's abilities and extent and type of injury, the size of a personal injury verdict cannot be justified solely by comparison with other verdicts[20] nor be established by reference to definite

---

[16]Cameron v. Evans, 241 Minn. 200, 62 N. W. (2d) 793; Kelley v. Chicago, B. & Q. R. Co. 142 Minn. 44, 170 N. W. 886; Gibson v. Chicago G. W. R. Co. 117 Minn. 143, 134 N. W. 516, 38 L.R.A.(N.S.) 184; Goss v. Goss, 102 Minn. 346, 113 N. W. 690; Flemming v. Thorson, 231 Minn. 343, 43 N. W. (2d) 225; Public Utilities Corp. v. McNaughton (8 Cir.) 39 F. (2d) 7.

[17]Giannone v. Reale, 333 Pa. 21, 25, 3 A. (2d) 331, 333.

[18]Quinn v. Chicago, M. & St. P. Ry. Co. 162 Minn. 87, 89, 202 N. W. 275, 276, 46 A. L. R. 1228.

[19]Kerzie v. Rodine, 216 Minn. 44, 11 N. W. (2d) 771; Turnmire v. Jefferson Transp. Co. 202 Minn. 307, 278 N. W. 159; Cole v. Chicago, St. P. M. & O. Ry. Co. (D. Minn.) 59 F. Supp. 443; 5 Dunnell, Dig. (3 ed.) § 2595.

[20]E.g., Thoirs v. Pounsford, 210 Minn. 462, 299 N. W. 16. Illustrative of this principle is Monday v. Millsaps (Tenn. App.) 264 S. W. (2d) 6, where a totally disabled man like plaintiff who was 32 years of age and earning $450 to $500 per month was awarded only $109,000 by the jury. The trial court ordered a remittitur to $90,000, and this was affirmed by the appellate court.

standards.[21]

However, by lack of a definite standard we do not forfeit our recourse to common sense and social practicality in given cases. Business and enterprise must continue, and, in the course of their operations, accidents will happen and injury result to employees and other persons such as plaintiff. It is incumbent upon the courts to impose the cost of supporting the individual injured upon the business and hence the ultimate consumer of its products in such a situation. But, at the same time, judicial care must be exercised lest a fatal financial burden be placed upon the industry out of sympathy for the plaintiff. See, Padrick v. G. N. Ry. Co. 128 Minn. 228, 231, 150 N. W. 807, 808, L. R. A. 1915F, 1.

Outside of the special damages for medical services and loss of wages to the time of trial, which amount to $23,104.07 and are conceded by defendant, the verdict in the instant case awarded plaintiff $251,895.93 for loss of future earning capacity, the cost of a daily attendant in the past and future, and pain, suffering, and disability. This sum if invested at three percent interest per annum would yield an annual income to plaintiff of $7,556.87, or approximately $629 per month, leaving the principal sum intact at his death. The jury apparently based this amount upon the following items:

(a) A 26-year-old man was awarded $85,167 for loss of future earning capacity, which sum will permit him to withdraw $300 per month over the estimated 40.75 years remaining of his life if invested at three percent interest. Damages for total loss of future earning capacity should be predicated upon a person's future earning power, and his age, skill, training, experience, and industry should be considered. Mitchell v. Walton Lunch Co. 305 Mass. 76, 25 N. E. (2d) 151; McCormick, Damages, § 86, pp. 300, 308. Proof of specific pecuniary loss is not essential. Ralston v. Dossey, 289 Ky. 40, 157 S. W. (2d) 739. The evidence in the instant case shows that plaintiff was earning 75 cents per hour at the time of his injury and that

[21]Crouch v. Chicago G. W. R. Co. 172 Minn. 447, 216 N. W. 234, certiorari denied, 277 U. S. 591, 48 S. Ct. 528, 72 L. ed. 1003; Gibson v. Chicago G. W. R. Co. 117 Minn. 143, 134 N. W. 516, 38 L.R.A.(N.S.) 184.

wages had increased to $1.05 per hour at the time of trial.[22] On the increased scale, plaintiff would have a gross pay of $42 per week for a 40-hour week plus time-and-a-half for overtime. Never in his life had he earned $500 in any single year from private employment, and his average gross earnings at the time of his injury were $225.37 per month. Plaintiff has not shown any possibility of promotion or pay increase except that truck drivers' wages were tending to increase at the time of trial. Beyond this evidence, the only facts bearing on plaintiff's earning capacity merely show that he had an eighth grade education, had no special trade or skill, was of limited occupational experience, and had never held a job for any appreciable length of time during the three years, exclusive of service time, since he left grade school at 16 years of age. Also, his performance of manual labor indicates that he would not maintain a constant earning level throughout his life but that his wages would decrease as he grew older. Littman v. Bell Tel. Co. 315 Pa. 370, 172 A. 687; Reitler v. Pennsylvania R. Co. 238 Pa. 1, 85 A. 1000. It is our opinion that an award for loss of future earning capacity based upon an average loss of income of $300 per month for the estimated 40.75 years remaining of plaintiff's life is excessive and not justified by the evidence in this case.

(b) Another factor in the verdict is the award of $86,347.98 for the future cost to plaintiff of a daily attendant, which the jury apparently awarded on the basis of the present cash value of $10 per day or $304.16 per month for the estimated 40.75 years remaining of plaintiff's life discounted by compounding interest at the rate of three percent annually. While the only testimony in the record bearing upon the reasonable cost of an attendant for plaintiff is Dr. Hall's opinion that it would be about $10 a day, we think it is unrealistic to predicate the assessment of plaintiff's damage therefor

[22]Plaintiff seeks to show that by this increase, total weekly wages increased 40 percent. However, such mathematical niceties are impossible since the weekly wage was composed of overtime for which plaintiff received time and a half pay. As the per hour wage increased, evidence produced showed that the overtime decreased so that the claim of a 40 percent increase is grossly inaccurate.

exclusively on the cost of an attendant employed on a day-to-day basis. In view of the type of nonprofessional assistance plaintiff will require, it appears unreasonable to us to claim that he cannot obtain the services of a competent daytime attendant in Thief River Falls for an average sum less than $304.16 per month for the estimated balance of his lifetime.

(c) Likewise, it is our opinion that an award of $9,300 for the nursing care provided by plaintiff's parents during the 31 months he was at home and not in a hospital preceding the time of trial is unreasonable and excessive. We have held that an injured person may recover the reasonable value of nursing services rendered him gratuitously by members of his family on the rationale that compensation in kind is expected of the one aided.[23] In this case the jury apparently assessed the reasonable value of such services at $300 per month, which roughly corresponds with Dr. Hall's estimate of the cost of hiring a practical nurse or attendant on a day-to-day basis. However, for the reasons previously stated, the reasonable value of the care provided by plaintiff's parents should not have been predicated solely on a mathematical extension of a daily rate charged by one hired on a day-to-day basis.

(d) The final element of damages in the instant case is the allowance for past and future pain, suffering, and disability. Plaintiff states that either five or ten dollars per day, which would produce figures of $91,670 or $164,670 when the amount of compensation is multiplied by the number of past and future days of plaintiff's life expectancy would be "adequate." An award for pain, suffering, and disability on a per diem basis ignores the subjective basis of such damages. Unlike loss of earnings or the cost of a medical attendant, pain, suffering, and disability recoveries cannot be reduced to mathematical formulae, and on this theory they have been exempted from

[23]Wells v. Minneapolis Baseball & Athletic Assn. 122 Minn. 327, 142 N. W. 706, 46 L.R.A. (N.S.) 606; see, Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797; Dahlin v. Kron, 232 Minn. 312, 45 N. W. (2d) 833; 5 Dunnell, Dig. (3 ed.) § 2572.

deductions for present worth.[24] Each day of suffering is a part of a whole and will vary and generally decrease as time goes on. To permit a per diem evaluation of pain, suffering, and disability would plunge the already subjective determination into absurdity by demanding accurate mathematical computation of the present worth of an amount reached by guesswork. This is especially true in plaintiff's case where his loss of sensory perception will limit his pain and suffering to mental reactions of embarrassment, humiliation, and frustration based upon his personality traits and which should greatly decrease as time passes. Certainly no amount of money per day could compensate a person reduced to plaintiff's position, and to attempt such evaluation, as in this case, leads only to monstrous verdicts. In view of the other elements of damage, it is apparent that the jury awarded plaintiff something over $70,000 for pain, suffering, and disability. It is our opinion that such an award for this element of damage is not justified by the evidence presented in the instant case.

For the foregoing reasons we conclude that the damages assessed by the jury in the total sum of $275,000 were clearly excessive and that it was an abuse of the trial court's discretion to allow the jury's verdict to stand. We find no passion or prejudice on the part of the jury in arriving at its verdict. Apparently the excessive verdict resulted merely from its unwitting acceptance of the figures submitted by plaintiff with respect to the foregoing elements of damage without appreciating that they were predicated upon an inadequate or improper factual foundation in each instance.

---

[24]The Pennsylvania court in Bostwick v. Pittsburgh Rys. Co. 255 Pa. 387, 389, 100 A. 123, stated: "Where the evidence enables the jury to find the loss of earnings or other element of damage, that a plaintiff will thereafter sustain from year to year, the present worth thereof may be ascertained but pain has no market value and cannot be accurately estimated in dollars and cents. And therefore calling upon the jury to fix a *separate yearly value* upon plaintiff's future pain and suffering, and reduce each of said annual amounts to its present worth, and then add the sum total, as a step in arriving at the verdict, would be a vain request, and tend to complicate instructions to juries in such cases." (Italics supplied.)

The order appealed from is reversed and a new trial is granted unless, within ten days after the filing of the remittitur in the court below, the plaintiff shall file a written consent that the verdict be reduced to the sum of $175,000. In the event that such consent be filed within the time stated, the order shall be and is affirmed.

Reversed on condition.

