No. 46,376

Warren E. Hampton by and through Thomas E. Hampton, Jr., his father and next friend, and Thomas E. Hampton, Jr., *Appellees*, v. State Highway Commission of Kansas, *Appellant.*

(498 P. 2d 236)

Opinion filed June 10, 1972.

*Eugene T. Hackler,* of Olathe, argued the cause, and *Joseph J. Poizner,* former chief attorney, state highway commission of Kansas, and *Robert C. Londerholm,* of Olathe, were with him on the brief for the appellant.

*George A. Lowe* and *Richard L. Roberts,* of Olathe, argued the cause and were on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is a highway defect case under K. S. A. 68-419 in which the jury awarded plaintiff a general verdict of four hundred fifty thousand dollars ($450,000.00) for his personal injuries and the loss of his automobile. The defendant Kansas state highway commission appeals.

The alleged defect involves an accumulation of water in the west-bound lane of a portion of U. S. Highway 56 which, at the time of plaintiff's injuries, was just south of the limits of the city of Olathe. (It has since been annexed.) The highway here is a four lane east-west road divided by a ten foot median strip. Each

two-lane portion is twenty-four feet wide and is crowned at the center, so that water will drain both to the edges of the road and toward the median. The median strip has on each side a combined eight inch curb and thirty inch gutter which catches the water and carries it to ditch inlets, which in turn funnel it into drains located in the center of the median.

From a point where the road is crossed by a railroad bridge known as the "Frisco Overpass" it extends west almost 900 feet to a break in the median strip. At the break is a "crossover" which allows access from each pair of lanes to driveways serving manufacturing plants on either side of the highway. A drain is located in the center of the median at each side of the crossover, the two being 100 feet apart.

Two hundred feet east of the crossover is a third drain, located at the low point in the longitudinal grade of the highway. It is on this drain and the surrounding highway that the controversy centers. From the low drain the road rises in each direction, 2⅝ inches per hundred feet to the west, past the crossover and its two drains, and 3⅝ inches per hundred feet to the east, toward the Frisco Overpass. There are no other drains in this 650 foot easterly stretch. The transition from downgrade to upgrade at the low point is not a sharp one, but is accomplished by a gradual "vertical curve" extending overall some 600 feet, making the grade immediately adjacent to the low drain almost flat.

The longitudinal grade is not to be confused with the drop from the crown of the road to the curb which, at the drain, was 2⅝ inches.

This drain, then, was gathering all water falling between the crown and curb for at least 650 feet to the east and 200 feet to the west in the west-bound lane. It was also serving a similar function for the east-bound lane. It is apparent that if it could not *for any reason* carry off all of this water as it fell, there would be an accumulation by the drain which could reach a depth of at least 2⅝ inches at the curb, growing shallower as it approached the crown. The pool thus created would also extend east and west, likewise growing shallower as the longitudinal grade rose. The testimony was that if the gutter and roadway were crown-full the pool would be 373 feet long at the curb. It would, of course, be shorter at the crown.

On August 8, 1967, shortly before 8:00 a. m. plaintiff was on his way to work in his 1965 Corvette. His route took him west on

the stretch of road described above, where he was traveling in the lane next to the median. It had been raining heavily earlier that morning (just when is disputed) and there was water on the road. He passed under the Frisco Overpass, hit water in the area of the low drain, and obviously lost control of his car.

His left front wheel jumped the median curb some 88 feet before he got to the crossover; his right wheel followed. Witnesses observed his car in the median—some say spinning—until it hit the drain at the east edge of the crossover. Apparently hitting the depression and ditch surrounding the drain, plaintiff's car "dipped" and went south into the east-bound lanes.

Oncoming traffic included a 43,000 pound tractor-low boy rig hauling a backhoe. Its driver, going only 25-30 miles per hour, was unsuccessful in avoiding plaintiff's car. In the ensuing collision plaintiff's Corvette "exploded" and was knocked back, to come to rest directly over the eastern crossover drain.

Plaintiff himself was thrown from his car at some stage in these events, and was found lying in the road north of its final resting place. He was severely injured, as will be discussed later, and his car was a total loss. He was knocked unconscious, and later retained no memory of the accident itself.

Statutory notice of plaintiff's claim was duly given in October, 1967, and this action was instituted on February 23, 1968. For the next year and a half discovery by both sides proceeded apace. Interrogatories were served, objected to, ruled on and answered; depositions were taken; documents were produced; and an amended petition and answer were filed.

Of particular significance is an exchange which took place on July 14, 1969, during a skirmish over interrogatories. The defendant was trying to pin plaintiff down on the exact highway defect claimed, insisting that his claims should be spelled out with particularity in the petition. The trial court summed up plaintiff's position this way:

"THE COURT: Well, it will be considered by the Court that it is the plaintiff's contention that the highway was defectively designed and constructed, and that the defects were as follows:

"That the highway was too flat.

"That it had inadequate drains and drainage to provide for the drainage of surface water.

"That the drainage system was not adequately maintained. And that by reason thereof, undue accumulation of water was upon the highway at the time of the alleged accident."

Further discussion elicited from plaintiff's counsel his contention that the size and location of the drains, their maintenance and the design of the highway "all combine together. In the first place, it is too flat and let me put it this way: If there had been the proper grade then the drains might have been adequate, but taking into consideration all the circumstances that exist on this segment of the highway, there were insufficient drains as well as the drains being improperly maintained, and particularly taking that into conjunction with the fact that the gradient or the road level or grade is too flat and does not provide sufficient runoff so as to utilize the drains and the drainage system."

On October 3, 1969, the matter was specially set for trial on December 1, 1969, and a pre-trial conference was set for November 24, 1969. This becomes important because on November 5, 1969, plaintiff served a proposed second amended petition, together with a motion for leave to file it. The only change of substance from the first amended petition, under which the parties had been operating for more than a year, was a new paragraph 5:

"5. That the portion of 56 Highway running generally east to west, approximately one-tenth of a mile south of Olathe, Kansas, is an improved, concrete surfaced, four-lane State, through highway; that said four-lane highway is divided by a curb median strip; that the north portion of said highway consists of two lanes for westbound traffic; that said westbound lanes are crowned in the center; that from a point west of the Frisco Overpass the said westbound lanes of 56 Highway are almost flat and without sufficient grade to permit natural and proper drainage, and that said condition continues westward and includes the median crossover west of the Frisco Overpass; that in the event of rainfall said westbound lanes receive water from the highway right-of-way and surrounding areas which accumulate and is impounded between the curb of the median strip and the crowned portion of the westbound lanes; that the accumulation of water appears to the user of the highway to be a level stretch of concrete, concealing the danger and defect; that said accumulation of water is impounded and does not drain for a considerable time for the reason that said highway and drainage system is defectively designed, constructed and maintained; that there are inadequate inlets to accommodate or properly drain off said water; there are an insufficient number of stormwater inlets; that the stormwater inlets installed are inadequate in size and design; that the inlets and water drainage system provided are inadequately maintained in that debris is allowed to accumulate and impede or stop the freeflow of water from the westbound portion of said highway; that said dangerous and defective highway was well-known to defendant and its employees, including maintenance employees; that said highway commission failed to rectify or repair said defects or to place warning signs or signals at or near said defective and dangerous condition, although said repairs or warn-

ings could easily have been given; that the failure to properly maintain, repair or warn as aforesaid is contrary to the statutes and the laws of the State of Kansas; that although said defective and dangerous condition was well known to the defendant, it was not known, and was in fact, concealed from the traveling public and, in particular, from the plaintiff; that said defective highway condition was further concealed by the overcast weather conditions, the rain, the blending color of water and pavement and the leveling effect caused by the impounding of water betwen the curb and crown in the center of the westbound lane; that the highway was dangerous to travelers thereon because of all of the circumstances and surroundings."

The trial court authorized the amendment by order of November 10, 1969, requiring an answer by November 21. A final pre-trial conference was held November 22, and the trial commenced December 1. The trial had previously been set for November 17, to be preceded by a pre-trial conference on October 3, but had been continued at the defendant's request.

The result was the verdict previously mentioned. After the commission's motions for a new trial and for judgment notwithstanding the verdict were overruled it perfected this appeal, designating 26 separate points to be relied upon. Eighteen of these are briefed, and we shall consider them in the order presented.

## I

The first and primary issue is whether the condition of the road constituted a "defect" within the meaning of K. S. A. 68-419. The commission urges that this is a pure question of law, and cites *Cronin v. State Highway Commission*, 182 Kan. 42, 318 P. 2d 1066, and the multitude of cases cited therein at page 44. We do not read that case so narrowly; we think the principles which have evolved from the cases are most aptly summarized in *Earnest v. State Highway Commission*, 182 Kan. 357, 320 P. 2d 847, at pages 359-60:

"The question whether an alleged defect comes within the purview of the statute is, in the first instance, a question of law to be determined by the court. There is no legal foot rule by which to measure conditions generally and determine with exact precision whether a given condition constitutes a defect. Some conditions may be so patently dangerous as to clearly constitute defects, while others may be so trifling as to be clearly outside the purview of the statute. The policy of courts is to handle each case separately and either to include it in or exclude it from the operation of the statute. Where circumstances are such that an alleged defect cannot be excluded from the operation of the statute as a matter of law, it presents a proper case for a jury to determine. Without any legal foot rule by which to measure an alleged de-

fective condition, it must be compared with general conditions and surrounding circumstances, and, in one sense of the word, the question whether a given condition constitutes a defect within the meaning of the statute is relative."

The allegation of defect here is two-pronged, the first being that there shouldn't have been any accumulation of water at all. That there was an accumulation is attributed by plaintiff to faulty design in making the road too flat, in incorporating too few drains, and in using drains with grates which tended to clog. The last deficiency was compounded, according to plaintiff, by failure to clean the drains in a timely manner. Plaintiff's evidence included expert testimony that the road gradient and the number and character of the drains were sub-par; defendant's expert asserted that the design in all respects met accepted standards prevailing at the time it was originated in 1957. Both agree that the completed highway conformed to the engineer's design and that at the time of the accident in 1967 it was substantially unchanged from its condition when completed in 1959.

We think it may fairly be said that there was room for difference of opinion on the adequacy of the design. We attribute no significance to the subsequent adoption by the commission of a standard which requires drainage sufficient to handle more intense storms than the standard prevailing in 1957 when this highway was designed. Adequacy of a design must be judged by conditions prevailing at the time it was adopted and not in the light of later experience or changing conditions. This principle received legislative recognition in 1972 House Bill 2063, effective March 25, 1972, which amended K. S. A. 68-419 to specifically so provide.

The commission argues that since the adequacy of its design was a matter of opinion and the design met 1957 standards there could be no "defect" under the statute. For this position it relies heavily on *Gould v. City of Topeka*, 32 Kan. 485, 4 Pac. 822. That was a city street defect case in which we noted that the adoption of plans was a discretionary matter for determination by the governing body and said (p. 493), "[W]here, upon the facts, it would be so doubtful whether the street, as planned or ordered by the governing board of the city, was dangerous or unsafe or not—that different minds might entertain different opinions with respect thereto—the benefit of the doubt might properly be given to the city, or rather to its governing board that planned or ordered that the street should be placed in such a condition. . . ."

But later, in *Klipp v. City of Hoyt,* 99 Kan. 14, 17, 160 Pac. 1000, it was pointed out that while *Gould* said the city "might properly" be given the benefit of the doubt, "It was not said that benefit of the doubt must be given the city" merely because reasonable minds might differ as to whether the street planned would be dangerous. The pudding was to be tested not by the recipe but in the usual way, the court saying (p. 16), "No matter how carefully plans of improvement were considered, and no matter how faithfully the adopted plan was executed, if the result were actual peril to persons using the street with due care the duty to make and keep the street reasonably safe for travel was not fulfilled and an action would lie in favor of one suffering injury consequent upon the breach of duty." See also, *Evans v. City of Hutchinson,* 99 Kan. 477, 162 Pac. 342.

The testimony here, from numerous witnesses, was that after any rain of consequence water accumulated in the passing lane. Evidence was introduced of at least five prior accidents which the participants blamed on the water; other drivers testified to having trouble navigating this particular stretch in rainy weather and having near misses. Part of this evidence was supplied by officers of the state highway patrol, Johnson County sheriff's office and Olathe police department. One witness said she had called the highway commission's maintenance department a day or two before the accident about the water and what appeared to her to be clogging of the drains. After, but on the same day, as the accident she saw commission employees pulling stringy material from the drains which appeared to be grass. They piled it beside the drain and it made "a large pile."

To evaluate the foregoing evidence the jury was instructed:

"Instruction No. 8. The State Highway Commission of Kansas would not be liable for damages to persons or property on the sole basis of errors or defects in the original design or plan of the highway in question unless the plan or design was known to said commission to be manifestly dangerous to users of the highway.

"However, after construction of the highway the State Highway Commission would be liable for damages resulting from a defect in the original plan where such defect is embodied in the construction work and is permitted to remain after the Highway Commission had notice of said defect, rendering the highway unsafe for the usage intended, for a period of five (5) days or more."

It may be seen that the first paragraph follows *Gould v. City of Topeka,* supra, while the second adds the qualification enunciated

in *Klipp v. City of Hoyt* and *Evans v. City of Hutchinson,* supra. We believe that as a whole this instruction was a fair statement of the law.

The second aspect of plaintiff's claim of defect was that, if water was to be present, the commission should have warned the unsuspecting traveler. There were no traffic control or warning signs in the area except a posting of the 60 miles per hour speed limit. The evidence from those familiar with the area—accident victims, law enforcement officers and customary travelers alike—was that when water was present it "blended" with the roadway so that it wasn't perceptible until a driver was in or almost in it.

Plaintiff's failure-to-warn theory was based on *Brown v. State Highway Commission,* 202 Kan. 1, 444 P. 2d 882, where we held that noncompliance with the duly adopted manual on uniform traffic control devices could constitute a liability-producing defect. There an allegation that a stop sign called for by the manual was improperly installed was held to present a jury question as to the presence of a defect. Here, the absence of a warning sign, arguably required by the same manual, is alleged as a defect. On this point the jury was instructed, in part:

"The duty of the State Highway Commission of Kansas to keep its highways reasonably safe for travelers does not require it to guard the traveling public from such normal hazards as ordinary puddles of water in the road, but where the accumulation of water is so wide or deep as to constitute an unsafe and dangerous condition, not reasonably to be anticipated by users of the highway, the State Highway Commission of Kansas has the duty to eliminate the hazard or to warn the public of its presence, or to barricade the way. However, in order to render the State Highway Commission liable for injuries resulting from a dangerous accumulation of water in the highway, they must have had notice or knowledge of the condition for a sufficient length of time to have taken precautions to guard against the injury and for a period of at least five (5) days."

We think this instruction, together with number 8 quoted above, correctly summarizes the commission's duty in this case. We may concede that it is impossible to design and construct a highway that is always free from water. Nevertheless, when experience shows that a particular portion is notorious for collecting water and that the accumulation has repeatedly proven hazardous, it becomes incumbent on the commission to take some remedial action. Improving the drainage is one possibility; if that is not feasible, some type of warning is the least that is owed to the unwary highway user.

In short, we believe this highway, arguably adequate in theory but unarguably an unmarked water hazard in practice, could reasonably have been found by the jury to constitute a "defect," and that the issue was properly submitted to them.

## II

The defendant's second point is that it should have had a judgment notwithstanding the verdict because the evidence fails to show a causal connection between the defect and plaintiff's accident. In particular, defendant points to the evidence concerning "hydroplaning." Plaintiff, through an expert, showed that a car with the characteristics of his would hydroplane at about 54 miles per hour if it hit water $\frac{9}{10}$ inch deep or more. This would cause a loss of contact with the pavement with a consequent loss of steering and braking ability. The argument is that, since hydroplaning could have occurred with this little an accumulation, the "defective" accumulation of 2½ inches was not the proximate cause of the accident.

The argument overlooks the additional testimony that when a car hits *any* water there will be a pulling toward the deeper water—here to the left, toward the median—regardless of whether hydroplaning occurs. It also overlooks evidence of a west-bound car which *earlier that morning* had hit the same water and had been thrown onto and over the median into the east-bound lanes. The fortunate driver of that vehicle encountered no 43,000 pound truck and was thus able to drive away—to the east, the direction he was heading when he came to rest.

There was sufficient evidence from which the jury could have found a causal connection between the water and the accident.

## III

Defendant next urges that there was insufficient evidence that it had the statutory five days notice of the defect. The argument here goes largely to the fact that the commission obviously didn't have specific knowledge that the drains were clogged on the day in question. The clogging was not, of course, the "defect," but only a contributing factor.

There was abundant evidence that the commission was on notice of the road's proclivity for catching water and its hazardous nature. James Malson, an agent for the Kansas Bureau of Investigation, while a Johnson County deputy sheriff, had been involved in a

near accident in water on the same highway almost two years before. Testimony of this accident was excluded, but he was permitted to testify that he had written the commission's director of safety and spoken to the commission's local maintenance personnel about it, asking for a survey of the drainage and demanding that they do something about it. In addition, several of the prior accidents had been reported, attributing their cause to the water in the area, and those reports were in the commission's files. In arguing its motion for a directed verdict counsel for the commission stated:

"Well, anyway, Malson testified and by that I think taking everything in favor of the plaintiff, I think it would be inferred that the State Highway Department had notice of a defective condition on the highway. By this, of course, I am not admitting this was a fact, but I am taking the evidence in the most favorable light possible.

"Then there were at least six or seven accidents brought up, prior accidents, to the Hampton accident, all of which if we take these accidents in the light most favorable to plaintiff, indicate that these accidents were caused by water, and solely by water, and by no other factor, and I think that that would establish that other accidents had occurred at the scene solely due to the cause of water."

This concession was appropriate, and disposes of the present contention.

## IV

Defendant objected to the admission of evidence of other accidents and general traffic conditions in the area. We think such testimony was relevant not only to the existence of the alleged defect but on the issue of notice, as pointed out in III above. In the case of each accident the trial court held a careful inquiry outside the presence of the jury as to its nature. Only when the court was satisfied that the accident occurred under similar circumstances was the evidence presented to the jury. We see no error in its admission.

## V

At the pre-trial conference on November 22, 1969, and again on the morning the case was finally to go to trial the defendant moved for a continuance. These motions were overruled, and the defendant claims error.

Defendant claims surprise because it first learned when the second amended petition was served November 5, that plaintiff would claim that the water was hard to see or that it should have

warned of the water's presence. While these claims were not spelled out in the prior petitions, it seems to us that they were an inherent part of the condition of the roadway over which the parties had been contending for almost two years. Defendant shows no prejudice from being told ahead of time, even if only three weeks, that plaintiff intended to dwell on one aspect of the road's condition. It had been defendant's position months before that the petition should be more specific as to the "defect."

It also complains because it first received plaintiff's formal list of witnesses on the morning of trial, and there were some persons listed who were new. However, at the time defendant's motion for a new trial was being argued it developed that counsel exchanged lists by agreement. There had been extensive discovery, and defendant does not single out any particular witness for which it was unprepared.

Finally, defendant seeks to justify its request for a continuance by the dismissal of plaintiff's father as a party. The father did not join the lawsuit on his own behalf and never filed a pleading. He was joined as an additional party plaintiff on defendant's motion for the ostensible reason that his name appeared as a co-owner on the title to plaintiff's car; only by joining him could defendant be protected from double liability for its destruction. This joinder was accomplished at the pre-trial conference. It developed, however, that defendant proposed to use the father's presence in the suit as a vehicle for introducing evidence of plaintiff's record of traffic violations as bearing on the father's claimed contributory negligence in permitting plaintiff to drive the car. On the day of trial the father's motion to dismiss whatever claim he had was sustained, but with prejudice as to any claim for loss of the car. As a practical matter any other claim he might have was then barred by the statute of limitations. Defendant's only possible complaint is that it had to make some alteration in its trial tactics since it would not be able to introduce evidence which it conceived to be damaging to plaintiff, although inadmissible against him (see part VIII, infra). This is hardly sufficient to make a continuance mandatory.

Defendant had been granted one continuance. Whether to grant another was within the discretion of the court. *Abston v. Medora Grain, Inc.*, 206 Kan. 727, 482 P. 2d 692, Syl. ¶ 1. We find no abuse of that discretion here.

## VI

Defendant complains of several of the instructions given by the trial court. As to some the court is satisfied the quarrel is one of semantics—defendant would have preferred amplification or a different emphasis, but can show no misstatement of the law. We shall not deal with those.

Of more consequence is the contention that as to the commission's duty to post warning signs the jury should have been told that this was discretionary, and that liability could arise only if the failure to warn was the result of arbitrary and capricious action. Instruction number 9 quoted verbatim K. S. A. 8-511 authorizing the adoption of a sign manual; number 10 sets out those portions of the adopted manual describing appropriate warning signs. It is true that number 10 does not include that portion of the manual cautioning against the indiscriminate use of warning signs, but we regard both instructions as mere background information for the jury. The crucial instruction on the commission's *duty* is found in number 11:

"Where some portion of a highway is defective and the highway authorities have had notice of it, it is their duty to set about its repair with reasonable promptness, and until that can be done, suitable warning signs should be placed to caution the public that the road is not in its usual condition of safety for public travel."

This appears to be a fair statement, and in accord with what we said in part I, above. Defendant's only objection to it is simply that it does not contain, within itself, any definition of a "defect." That definition is supplied elsewhere, particularly in number 7, which provides in part:

"What constitutes an actual highway defect must be a condition or object therein which makes the highway unsafe and dangerous for travel and use and is the legal cause of the injury of which complaint is made. In the final analysis, whether a particular condition or situation is a highway defect depends upon the facts and circumstances of each case."

We proceed on the well established principle that instructions are to be read together, without isolating one and considering it in a vacuum. (*Huxol v. Nickell,* 205 Kan. 718, 473 P. 2d 90, Syl. ¶ 6.)

The answer here is that we are not dealing with the commission's exercise of discretion any more than we are dealing with its negligence or lack of it. Its action or non-action is judged by the result —*i. e.,* whether it produced such a hazardous condition that it constituted a "defect" in the highway. The absence of a warning sign

was one factor to be considered in making that judgment, regardless of any mental processes involved in the decision making.

An instruction on "emergency" was given, and defendant claims it was not called for by the evidence. But contributory negligence was a prime defense, putting plaintiff's degree of care squarely in issue. From the evidence of the deceptive appearance of the water the jury could well have found plaintiff was confronted with an emergency. Since defendant was asking the jury to evaluate plaintiff's conduct, we think it was proper for the court to define the degree of care required of him.

Finally, defendant objects to an instruction that plaintiff's life expectancy was 51.1 years, based on standard mortality tables, when there was medical evidence placing it at about twenty years because of the injuries. Defendant's point is that future pain and suffering must be limited to actual life expectancy, with consideration being given to the effect of the injuries suffered.

The instruction given is P. I. K. number 9.45, which does not purport to bind the jury and authorizes them to consider all relevant factors in determining actual life expectancy. In another instruction they were advised to limit damages for future pain and suffering to "those he is reasonably certain to experience in the future." The instruction given was proper, and was adequate when considered in context.

## VII

Defendant submitted a proposed instruction on the duty of a driver to keep a lookout and to use due care, commensurate with the conditions obtaining. The court declined to give the requested instruction, but gave P. I. K. number 8.03 on lookout and number 3.01 on negligence. Defendant's requested instruction was more elaborate and gave more emphasis to its theory, but we cannot say it was required for that reason. While we should not, in defendant's words, "become slaves to the *Pattern Instructions for Kansas*," a trial court should likewise not place undue emphasis on one theory of a case or let its instructions become argumentative. (*Huxol v. Nickell,* supra, Syl. ¶ 5.) The instructions given adequately covered their subjects.

## VIII

Defendant urges that it should have been allowed to show plaintiff's record of traffic citations and his interest in drag racing.

It suggests first that his prior "crimes" were admissible under K. S. A. 60-455 to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Really, of course, it wanted to show that plaintiff had a "disposition" to speed, which is exactly the purpose for which the statute makes the evidence inadmissible. See *Gardner v. Pereboom*, 197 Kan. 188, 416 P. 2d 67; *Scogin v. Nugen*, 204 Kan. 568, 576, 464 P. 2d 166.

It also suggests that *if* loss of "enjoyment of life" were a compensable item of damages, and *if* plaintiff had sued for such, the evidence would *then* have been relevant to this item of damages. We surmise that this argument is put forth with the commission's collective tongue in its collective cheek.

## IX

Defendant was precluded from showing that plaintiff was not wearing his seat belt at the time of the accident. It urges that failure to "buckle up" was contributory negligence, and that it shows a failure to mitigate damages.

Admissibility was urged on the second ground in *Britton v. Doehring*, 286 Ala. 498, 242 So. 2d 666. That court reviewed numerous cases in which the issue has been considered and concluded (p. 508):

"We confess that not all the reasons other courts have given in support of their decisions disallowing the seat belt defense in mitigation of damages impress us. But we are impressed, first of all, by the fact that of those jurisdictions which have decided the question only one has admitted evidence of nonuse to mitigate damages. This fact, in itself, is of some persuasive substance.

"The reasons which do impress us as being sound and those on which we rely for our holding are:

"(1) *There is no statutory requirement in Alabama* that seat belts be installed or that they be used.

"(2) In the absence of a statutory requirement admission of evidence of nonuse of available seat belts can only be justified by resort to *common law principles* under our established rules of evidence. That is, by our taking notice of studies demonstrating that seat belts are effective protective devices and our requiring their use. In view of the controversy which still surrounds the effectiveness of seat belts, particularly in those situations in which injuries may even be attributable to wearing seat belts, we are unwilling now to accept such studies as of decisive probative value. If we adopted such a requirement would it not result in every passenger's being forced to 'buckle up' or risk a jury's adverse verdict?

"(3) To admit such evidence of nonuse would permit the jury to '*compare*

*the damages'* which in practical effect might reach almost the same result as 'comparative negligence'—a doctrine unknown to Alabama law.

"(4) To admit such evidence would create the anomalous situation in which a plaintiff in *a vehicle equipped with seat belts would be penalized* as compared with a plaintiff in a vehicle unequipped with seat belts.

"(5) Requiring one to use available seat belts results in one who is lawfully using the highways having to *anticipate that another driver may be negligent.*

"(6) Permitting the jury to compare the damages attributable to the negligence of a defendant with that attributable to a failure to use available seat belts would allow the jury to enter into the *realm of speculation and conjecture.*

"(7) Adoption of such a requirement may *conflict with traditional tort doctrines* such as contributory negligence, avoidable consequences and last clear chance.

"We do believe that if motor vehicles in Alabama are to be required to have seat belts installed and if passengers are to be made to wear them under all driving conditions, this decision should be left to the legislature, as several courts have suggested." (Italics in the original.)

We concur generally with this reasoning. As may be seen, much of it is equally applicable to the contributory negligence defense, although that was apparently not even urged on the Alabama court.

Our own legislature has required new cars sold after October, 1966, to be equipped with seat belts (K. S. A. 1971 Supp. 8-5,135) but it has not made their use mandatory, nor has it required them to be installed on older vehicles. Plaintiff was therefore not violating any statutory duty. Neither, we believe, was he falling below the standard required of the reasonable, prudent man. We have nothing before us on which we could confidently base a finding that the accepted community standard of care requires one to buckle up routinely; experience dictates to the contrary. Some people, in fact, deliberately refuse to wear seat belts for fear of aggravating an injury or being trapped in a collision. If such persons are to be declared unreasonable in their concern for their own safety as a matter of law, we believe with the Alabama court that at this stage the declaration should be legislative and not judicial.

While as a general rule one must use reasonable diligence to mitigate one's damages once the risk is known (*Atkinson v. Kirkpatrick,* 90 Kan. 515, 135 Pac. 579), one is not required to anticipate negligence and guard against damages which might ensue if such negligence should occur (*Rig & Reel Co. v. Oil & Gas Co.,* 111 Kan. 37, 205 Pac. 1020). So likewise the traveler has the right to assume the highway is reasonably safe for travel—as the jury here was instructed without objection.

In short, there was no duty to use a seat belt, either under the common law standard of due care or to mitigate damages. That being so, the trial court did not err in excluding evidence of plaintiff's nonuse for it was not relevant to any issue to be determined.

## X

Defendant urges that plaintiff was guilty of contributory negligence as a matter of law because he was presumably familiar with the road and should have known there would be water present, and also because he must have been traveling too fast. The short answer to this contention is that reasonable minds might differ on both points, and they were therefore properly submitted to the jury. *Morris v. Hoesch,* 204 Kan. 735, 466 P. 2d 272, Syl. ¶ 4. *Elliott v. Chicago, Rock Island & Pac. Rld. Co.,* 203 Kan. 273, 454 P. 2d 124, Syl. ¶ 3.

Error is claimed because of comments made by the trial court in the presence of the jury in three separate instances. The first was occasioned by an objection to testimony concerning the cleaning of the drain at times subsequent to the accident. The objection was that it showed remedial conduct (and thus was inadmissible under K. S. A. 60-451). The court sustained the objection, saying:

"THE COURT: Members of the jury, the Court has sustained an objection to the last question, for reason that evidence of remedial conduct is not admissible to prove negligence or culpable conduct in the first instance, and accordingly, you shall give the matter no consideration whatsoever. The motion to strike is sustained."

The objection is to the court's use of the terms "negligence or culpable conduct," elements which are mentioned in the statute on which the objection was based but which are not issues in a highway defect case insofar as the commission is concerned. The commission moved for a mistrial on the grounds that the court's remarks might mislead the jury into thinking those elements *were* in issue; the court offered to admonish the jury, but counsel declined the offer. The remark was clearly an inadvertence, wholly understandable in view of the grounds for the objection. An admonition would surely have cured any misunderstanding that might have arisen, but defendant chose to forego that remedy. The instructions did include the usual admonition that the jury was not to concern itself with the reasons for the court's rulings on the admissibility of evidence or to draw any inferences from such rulings. It strikes us that was sufficient.

The second comment came when defendant offered the investigating officer's accident report into evidence:

"THE COURT: The court, in ruling upon defendant's Exhibit O, finds that the same is not admissible. The Supreme Court of Kansas has ruled, in several cases, that they are not admissible and it will be rejected."

It is claimed this embarrassed counsel and depreciated him in the eyes of the jury. While we may admire counsel's exquisite sensitivity, we find it hard to believe the comment substantially prejudiced the jury against his client's cause.

Finally, a colloquy transpired concerning the admissibility of an accident report made by one John Hamby, the victim of one of the prior accidents. When it was offered defense counsel acknowledged the commission's *receipt* of the report, but denied *notice of the defect.* The court concluded:

"THE COURT: Well, Plaintiff's Exhibit No. 72 will be admitted for the limited purpose of showing notice of an alleged defect in Highway K-56 approximately one half mile west of I-35 exit on Highway 56, and for no other purpose."

There was no objection to the remark at the time. The objection now apparently is that the trial court was disagreeing with counsel's protestations that "receipt" of the report and "notice" of the defect were two different things—although, of course, plaintiff's purpose in offering it was precisely to show notice, and that was the purpose for which it was admitted. We can only say that the error claimed here does not clearly appear.

## XII

At trial defendant offered by way of deposition the opinion testimony of the investigating officer that plaintiff was going 80 miles per hour before the accident. The offer was rejected, and defendant asserts error.

The officer had had three years' experience as a police officer and one year as a deputy sheriff. His training in accident investigation had consisted of one week under the tutelage of a highway patrolman. He had had no special training in accident reconstruction. Whether a witness is competent to express an expert opinion is to be determined by the trial court in the exercise of its discretion. *Avey v. St. Francis Hospital & School of Nursing,* 201 Kan. 687, 442 P. 2d 1013; *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 431 P. 2d 518. We cannot say the court abused its discretion here. Additionally, we note that defendant *did* produce an

accident reconstruction expert with unquestioned qualifications who gave his opinion that plaintiff was traveling between 50 and 70 miles per hour when he hit the curb.

## XIII

Defendant further complains that several eyewitnesses were permitted to testify over its objection that they observed nothing "unusual" or "abnormal" about plaintiff's speed. There is no doubt that these expressions are conclusory in nature, embodying the opinion of the witnesses. However, we long ago recognized that lay opinions on the observed speed of an automobile are proper. *Miller v. Jenness,* 84 Kan. 608, 114 Pac. 1052. We think this is a subject fairly within the statute, K. S. A. 60-456, authorizing non-expert opinion evidence where it is "rationally based on the perception of the witness" and is "helpful to a clearer understanding of his testimony."

## XIV

Was the verdict excessive? Plaintiff was a young man just a month shy of twenty years of age. He had graduated from high school in the middle of his class, had completed one semester of junior college, and had completed six months of military service. He had been in excellent health, and was employed in a warehouse as a crew leader. His earnings for the immediately preceding year had been over $5,000. He was planning to be married.

The immediate result of the accident was to place him in a critical condition, requiring initial hospitalization for over three-and-a-half months. He had a tear of the envelope which surrounds the brain in the right base of the skull so that spinal fluid leaked out of the right ear. He had a right facial nerve palsy. There was a fracture in the right base of the skull extending up into the occipital and temporal areas of the skull, with evidence of injury to the brain stem and a cerebral contusion resulting in permanent involvement of the left side of the brain. The left eye was in a laterally deviated rest position. There were innumerable small abrasions and lacerations and contusions of his scalp, face, arms, legs and trunk. X-rays disclosed fracture of the eighth thoracic vertebra with a dislocation which completely severed the spinal cord.

The permanent result was complete paraplegia, with total loss of all sensation and motor control below the severance of the

spinal cord. This includes loss of control of bowel movements and the passage of urine and the inability to perform sexual acts. His attending neuro-surgeon observed, "I feel that complete paraplegia is the most tragic condition which I treat that can happen to a young, healthy adult male."

With the paraplegia goes the prospect of almost certain recurring medical problems, notably infections of the kidney-ureter-bladder system, stone formation in that system, ulcers on the hip bone pressure points, and depression.

Some of these problems had already arisen between plaintiff's first release from the hospital and the time of trial. He had been hospitalized four more times, largely for urinary problems. One episode was acute, requiring the internal crushing of stones by an instrument.

Medical expenses to the time of trial were $15,641.47.

Constant care is required even when plaintiff is in what is now his normal condition. He must be attended when he bathes; his colon must be emptied by use of a suppository, a two to four hour operation; his catheter or urosheath must be attached and cleaned. The last requires the services of a doctor on occasion. At the present these services are being performed by his parents—his mother testified that she spent about 18 hours per day tending to him. (Parents, of course, are not available forever, and plaintiff had turned 21 before trial.) A hospital administrator testified such services should be rendered by a nurse. A licensed practical nurse, at present rates, would cost from $375 to $450 per month for a forty hour week. A registered nurse would be considerably more.

He is also subject to depression and has undergone a marked personality change. Social gatherings make him uncomfortable, as does eating in public. His neuro-surgeon testified, "[I]n 26 years of doing this type of work only, that is neurological surgery, I have seen but only one of hundreds of paraplegic patients, only one in that entire number who did not at some time go through a very profound mental and emotional depression." This may require psychiatric treatment.

His present earning capacity is virtually nil. An economist testified as to the present worth of his lost earning capacity, discounting future earnings and accounting for anticipated inflation at what he considered a conservative rate. He did this on three bases: first, the $5,000 plaintiff had actually earned in the prior year; second, the

$6,610 median annual earnings of all employed males over 14; and third, the $7,244 median annual earnings of all employed male high school graduates. The figures reached were, respectively, $239,300, $315,460 and $345,464.

It was the witness' opinion that as plaintiff gained experience and seniority, and as a median high school graduate, he could reasonably be expected to attain the median of all employees, if not that of all high school graduates. His direct economic loss from future earnings was therefore placed in the witness' best judgment at a minimum figure of $315,460.

Defendant attacks this figure by questioning the assumptions underlying the expert's conclusions. This goes to the weight of the evidence, and was no doubt argued to the jury. We are not prepared to say they were wholly unreasonable.

We thus have evidence of the following items of damage:

| | |
|---|---|
| Automobile (stipulated) | $3,390.00 |
| Medical to time of trial (stipulated) | 15,641.47 |
| Lost earning capacity (median) | 315,460.00 |
| | $334,491.47 |

Nursing care, at $400 per month and assuming a life expectancy of only 20 years, could add $100,000 for a single shift; if eighty hours per week were required the figure would double.

On top of this there was the inevitable cost of future medical expense, and the intangible, incalculable, but indubitably real element of pain and suffering, past and future. As to this element we have said:

"Generally speaking, it may be said that no verdict is right which more than compensates, and none is right which fails to compensate. Pain and suffering have no known dimensions, mathematical or financial, and there is no exact relationship between money and physicial or mental injury or suffering, and the various factors involved are not capable of exact proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries sustained, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." (*Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321, Syl. ¶ 3.)

Taking it all together, we cannot say that the $450,000 arrived at by the jury here was excessive or not within the evidence.

## XV

The commission says it had no notice of the defect in question—or at least no notice that this stretch was any more dangerous than the rest of the highway system. The point is refuted by the evidence noted under part III, above.

## XVI

Defendant complains of the admission of the Hamby accident report, referred to in part XII above. It was admitted for the sole purpose of showing notice to the commission of the tendency of the road to collect water, and that was made clear by the trial court. The details as to how it occurred and the amount of water then on the highway were not relevant to plaintiff's accident, and we don't see how the jury could have so considered them. The report was admissible for the purpose for which it was received, and we see no prejudice.

## XVII

Defendant claims an abuse of discretion in permitting plaintiff to file his second amended complaint, although conceding in its brief that, "The decision to grant leave to amend is solely within the discretion of the trial judge," citing *Hoover Equipment Co. v. Smith*, 198 Kan. 127, 422 P. 2d 914. Its contention again is that the amendment interjected the issues of concealment of the water and failure to warn which, it contends, amounted to a whole new cause of action which was barred by the statute of limitations.

The point is largely disposed of by what we said when it was raised on the denial of defendant's request for a continuance under point IV above. The fact that the water was hard to see and there was no warning of its presence did not constitute a separate cause of action, it was but one of the elements of the overall condition which the jury found to be so hazardous as to constitute a "defect."

## XVIII

Finally, the trial court refused to instruct that plaintiff's presence on the wrong side of the road gave rise to a presumption of negligence. In the commission's brief its position is put this way:

"It is well established in the State of Kansas that contributory negligence is never presumed, must be established by proof. See *Newman v. Case*, 197 Kan.. 689, 413 P. 2d 1013 (1966); *Borggren v. Liebling*, 198 Kan. 161, 422 P. 2d 884 (1967). It is equally well settled that the violation of a statute does not render the violator negligent as a matter of law. See *DeGraw v. Kansas*

*City & Leavenworth Transportation Company,* 172 Kan. 713, 228 P. 2d 527 (1951). In this case the evidence clearly established that the plaintiff violated the statutes of the State of Kansas by driving on the wrong side of a highway. It is also uncontroverted that the acccident occurred while the plaintiff was driving on the wrong side of the highway. See K. S. A. 8-539a.

"It is respectfully submitted that this uncontroverted, established violation of the traffic laws of the State of Kansas constituted a prima facie case of negligence wherein the burden of proof shifted to the plaintiff to establish or to explain that it was not the proximate cause of the accident. That is to say a burden of proof should be placed upon the plaintiff to establish why he was driving on the wrong side of the road."

The commission correctly assumes the burden of proving contributory negligence. Plaintiff's mere presence on the wrong side of the road did not meet this burden, for there was ample evidence to explain why plaintiff was there and to show that he was not "driving" there by choice. Once this appeared, any presumption of the "fact" of negligence vanished. K. S. A. 60-414 (*b*) provides:

". . . if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

Negligence, then, was to be determined "as if no presumption was or had ever been involved," and it would have been erroneous to instruct on such a presumption.

This case was vigorously tried and ably and exhaustively briefed and argued on appeal by both sides. After careful review of the voluminous record we are satisfied the parties had a fair day in court and no reversible error was committed. The judgment is therefore affirmed.

APPROVED BY THE COURT.

SCHROEDER, J., dissenting: Except on the matter of damages awarded by the jury in this case, I approve the court's opinion. To me a verdict of $450,000 on the facts in this case shocks the conscience. But on the record here presented the damages awarded are also subject to challenge on other points.

The court in approving the amount of damages awarded in this case specifically set forth evidence showing $315,460 as direct economic loss from future earnings over a period of 46 years because of injuries sustained by Warren E. Hampton, calculated on the

basis of an earned median income of all employed male citizens in the United States, 14 years of age and over, in the year 1966. The plaintiffs' expert witness on economics who testified concerning the loss of earnings was Ronald Calgaard. After giving considerable testimony he reduced the loss of future earnings to an estimated present worth by using a 5% interest rate to discount the $315,460. According to his calculations the estimated present worth of such future loss of earning capacity was $119,227.

To increase the present estimated worth of lost future earnings the witness then added an average annual rate of *inflation* at 5% per year, compounded. He explained the effect of increasing the present worth of the estimated future loss of earnings "at five percent per annum per year over the 46 years of his [Warren E. Hampton's] working lifetime, . . . was just exactly equal to the assumed rate of discount" with which he was working.

In the court's opinion the sum of $315,460 was evidence of the item of damage described as "Lost earning capacity (median)." In my opinion this is erroneous. If the jury in determining the amount of damages discounted Warren E. Hampton's loss of earnings at 5% (assuming this to be the proper rate), the proper damage for loss of future earning capacity had a present worth of $119,227. Using this approach the damage assumed by the court as shown by the evidence for this item is excessive by $196,233.

On the other hand, if the jury accepted the expert testimony of Ronald Calgaard at its face value and allowed $315,460 as the loss of future earnings over a 46-year period, it took into consideration the *inflationary factor* built into that figure by the witness, resulting in a verdict incorporating an item of damage for inflation in the amount of $196,233.

Although the record discloses no objection made by the appellant to testimony of the expert witness on the inflationary factor, it quite definitely resulted in an award of damages by the jury based upon speculation.

It is generally held an award for future loss of earning capacity should be reduced to present value. (*Frankel v. United States*, 321 F. Supp. 1331 [E. D. Pa. 1970]; and *Missouri-Kansas-Texas Railroad Co. v. Edwards*, 361 P. 2d 459 [Okla. 1961].)

Other jurisdictions have generally considered evidence of future inflationary trends as speculative, and therefore incompetent evidence for a jury's consideration. Lost future earnings should be

based on present economic facts. (*Raines v. New York Cent. R. Co.*, 129 Ill. App. 2d 294, 263 N. E. 2d 895; and *Sleeman v. Chesapeake and Ohio Railway Company*, 414 F. 2d 305 [6th Cir. 1969].)

In the *Sleeman* case the court said:

"The District Judge did, as appellant asserts, decide to award damages without reducing them to present worth. He did so because he held that inflationary trends would offset any present worth reduction. *See* Gowdy v. United States, 271 F. Supp. 733 (W. D. Mich. 1967).

. . . . . . . . . . . . .

" '[I]n computing damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.' Chesapeake & Ohio Ry. v. Kelly, *supra* at 491, 36 S. Ct. at 632.

"To date Chesapeake & Ohio Ry. v. Kelly has not been amended or overruled, and it was error to fail to apply it to the computation of future earnings.

"As to the inflationary trend offset, this record provides no evidentiary basis for the decision of the District Judge. Gowdy v. United States, *supra*, in which the District Judge arrived at the same conclusion after hearing some economic testimony is not authority for the offset in this case, since it has been reversed on other grounds. Gowdy v. United States, 412 F. 2d 525 (6th Cir. 1969). Nor do we encourage the trial courts of our circuit to explore such speculative influences on future damages as inflation and deflation.

"Of course, the nation's economic history since the 1930's would appear to make the use of present wages as the standard for loss of future earnings somewhat unfair to plaintiffs. But as to the future, the inflation versus deflation debate rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. And if testimonal [testimonial] resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions. *See* McWeeney v. New York, N. H. & H. R. R., 282 F. 2d 34 (2d Cir. 1960).

"Harper & James accurately describes the past history of this debate and the present prevailing view:

" 'Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly

return. It is not at all clear that courts would be willing to hear experts on the matter, or that they would get much real help if they did. For the most part the problem—which is inevitably present in every case of future loss—is not analyzed and the present value of money is assumed to be the proper basis.' II F. Harper & F. James, The Law of Torts § 25.11 (1956). . . ." (pp. 307, 308.)

The appellant in its brief challenges the damages awarded on the ground the total award included over $300,000 for pain and suffering. On the record here presented an analysis of the jury's award is made difficult because no special verdict was requested nor was an itemization of the damages awarded given. The appellant has no doubt incorporated the $196,233, above mentioned, in the $300,000 total. Conceding that it is difficult to place a value on pain and suffering, an award of damages for future pain and suffering must be based on *probable expectancy of life in the plaintiff's injured condition.* (See *Crecelius v. Gamble-Skogmo, Inc.,* 144 Neb. 394, 13 N. W. 2d 627 [1944].) The testimony of Raymond W. Stockton, M. D. projected a 20-year life expectancy for the plaintiff Warren E. Hampton due to his injuries.

In *Ahlstrom v. Minneapolis, St. P. & Sault Ste. Marie R. Co.,* 244 Minn. 1, 68 N. W. 2d 873 (1955), an award of over $70,000 for pain, suffering and disability of a 21 year old man with a life expectancy of 40.75 years was held to be excessive. There the trial verdict was $275,000 but was reduced to $175,000. The injuries sustained by the plaintiff there, also a paraplegic, were similar to those sustained by Warren E. Hampton in this case.

In my opinion the jury was confused by the evidence on damages when it rendered a verdict of $450,000.

Under all of the facts and circumstances presented by the record herein, it is submitted $200,000 of the amount awarded by the jury should be remitted, or the defendant granted a new trial on the issue of damages.

KAUL, J., joins in the foregoing dissent.

FROMME, J., concurring. The jury returned a general verdict. Items of damage such as future earnings were not separately determined. Therefore it is as reasonable to assume that the major portion of the verdict was for future pain, suffering and nursing care as it is to assume it was for loss of earning capacity with a

built in inflationary figure. In this case this court has not approved the use of an inflationary factor in determining loss of future earnings. Therefore I approve the majority opinion.

FONTRON, J., joins in the foregoing concurrence.